# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA

**No.: 1:22-cv-00114-MR-WCM**

**IN RE MISSION HEALTH ANTITRUST LITIGATION**

**HCA DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................1

FACTUAL ALLEGATIONS AND BACKGROUND .........................................5

    A.    The HCA Defendants. ...........................................................5

    B.    The Plaintiffs. ......................................................................5

    C.    Summary of Plaintiffs' Allegations. ....................................6

LEGAL STANDARD .......................................................................................7

ARGUMENT ...................................................................................................9

I.    THE COMPLAINT FAILS TO ALLEGE DEFENDANTS UNLAWFULLY OBTAINED OR MAINTAINED A MONOPOLY. .......10

    A.    The Complaint Fails To Allege That Mission Unlawfully Obtained or Maintained Monopoly Power for GAC Services. ..........10

        1.    The Complaint's Market Share Data Are Insufficient ............10

        2.    Plaintiffs' Other Allegations Do Not Plead That Mission Unlawfully Maintained Monopoly Power ...............................12

    B.    The Complaint Fails to Allege That Mission Unlawfully Obtained or Maintained Monopoly Power for Outpatient Services. ...............................14

II.    THE COMPLAINT ALLEGES NO EXCLUSIONARY, ANTICOMPETITIVE CONDUCT. .........................................14

III.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE THAT THE CHALLENGED CONDUCT SUBSTANTIALLY AFFECTED COMPETITION. .......18

    A.    The Rule of Reason Applies. ...........................................19

    B.    The Complaint Fails to Allege with Direct Evidence That the Offending Contractual Terms Harmed The Market As a Whole.......21

    C.    The Complaint Fails to Allege With Indirect Evidence That A Substantial Volume of Commerce Was Foreclosed. .........................24

CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

**Other Authorities**

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
    646 F. Supp. 2d 489 (S.D.N.Y. 2009) ................................................................16

*Am. Express Travel Related Servs. Co. v. Visa U.S.A.*,
    No. 04 CIV.8967(BSJ), 2005 WL 1515399 (S.D.N.Y. June 23, 2005).............25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................7

*Banxcorp v. Bankrate, Inc.*,
    2008 WL 5661874 (D.N.J. July 7, 2008) ...........................................................16

*Barry v. Blue Cross of Cal.*,
    805 F.2d 866 (9th Cir. 1986) ..............................................................................19

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................passim

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2007) ..............................................................................19

*Compliance Mktg., Inc. v. Drugtest, Inc.*,
    2010 WL 1416823 (D. Colo. Apr. 7, 2010) ........................................................20

*Con'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977)...............................................................................................19

*D&M Farms v. Birdsong Corp.*,
    No. 2:19-CV-463, 2020 WL 2501444 (E.D. Va. May 14, 2020)...................8, 18

*DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*,
    376 N.C. 63, 98 S.E.2d 169 (2020) ......................................................................2

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ................................................................................8

*Duke Energy Carolinas, LLC v. NTE Carolinas II,* No.
    319CV00515KDBDSC, 2022 WL 2293908 (W.D.N.C. June 24, 2022)...........11

Case 1:22-cv-00114-MR   Document 45-1   Filed 09/09/22   Page 3 of 31

*Estate Constr. Co. v. Miller & Smith Holding Co.*,
    14 F.3d 213 (4th Cir. 1994) ..................................................................8

*Gordon v. Lewistown Hosp.*,
    272 F. Supp. 2d 393 (M.D. Pa. 2003)..................................................14

*In re Aluminum Warehousing Antitrust Litig.*,
    No. 13-MD-2481 KBF, 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ...........23

*Int'l Const. Prod. LLC v. Caterpillar Inc.*,
    2016 WL 264909 (D. Del. Jan. 21, 2016) ..........................................20

*King Drug Co. of Florence Inc. v. SmithKline Beecham Corp.*,
    791 F.3d 388 (3d Cir. 2015) ..............................................................22

*Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*,
    2015 WL 5712640 (M.D.N.C. 2015) ..................................................8

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..........................................................................23

*Methodist Health Servs. Corp. v. OSF Healthcare*,
    No. 113CV01054SLDJEH, 2016 WL 5817176 (C.D. Ill. Sept. 30,
    2016), *aff'd* 859 F.3d 408 (7th Cir. 2017) ..................................24, 25

*Okasen v. Page Memorial Hosp.*,
    945 F.2d 696 (4th Cir. 1991) ............................................................21

*Pac. Bell Tel. Co. v. linkLine Communs., Inc.*,
    555 U.S. 438 (2009)....................................................................10, 13

*R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) ..............................................20

*Sidibe v. Sutter Health*,
    No. C 12-04854 LB, 2013 WL 2422752 (N.D. Cal. June 3, 2013) ...........passim

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
    8 F.4th 479 (6th Cir. 2021) ..............................................................13

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*,
    997 F. Supp. 2d 142 (D.R.I. 2014) ....................................................24

iii

*TechReserves Inc. v. Delta Controls Inc.*,
No. 13 CIV. 752 GBD, 2014 WL 1325914 (S.D.N.Y. Mar. 31, 2014) ............21

*Tops Mkts. Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998)..................20, 24

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
959 F.2d 468 (3d Cir. 1992) ..............................................................19

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
248 F. Supp. 3d 720 (W.D.N.C. 2017)..........................................18

*United States v. Container Corp. of Am.*,
393 U.S. 333 (1969)........................................................................20

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)........................................................................11

*Water Transp. Ass'n v. Interstate Commerce Com.*,
722 F.2d 1025 (2d Cir. 1983) ........................................................20

*Wholesale Alliance, LLC v. Express Scripts, Inc.*,
366 F. Supp. 3d 1069 (E.D. Mo. 2019) ..........................................16

*Williams v. Ests. LLC*,
No. 1:19-CV-1076, 2020 WL 887997 (M.D.N.C. Feb. 24, 2020).....................7

**Statutes**

N.C.G.S. § 131E-192.1(4) .......................................................................1

**Other Authorities**

Press Release, N.C. Dep't of Justice, Attorney General Josh Stein Does Not
Object to Mission/HCA Deal (Jan. 16, 2019), https://ncdoj.gov/attorney-
general-josh-stein-does-not-object-to-mis-d1/ [https://perma.cc/5Q2T-
QSXD] ..................................................................................................6

Case 1:22-cv-00114-MR   Document 45-1   Filed 09/09/22   Page 5 of 31

The HCA Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Class Action Complaint (the "Complaint"), Dkt. No. 43, filed by plaintiffs City of Brevard ("Brevard"), Buncombe County ("Buncombe"), City of Asheville ("Asheville"), and Madison County ("Madison"), collectively (the "Plaintiffs").

## INTRODUCTION

For over 130 years, the Mission Health system ("Mission") has provided high quality inpatient and outpatient services to the people of western North Carolina. Between 1995 to 2017, Mission did so under a Certificate of Public Advantage or "COPA." The COPA was a regulatory regime established by the Legislature to "foster improvements in the quality of health care for North Carolina citizens, moderate increases in cost, improve access to needed services in rural areas of North Carolina, and enhance the likelihood that smaller hospitals in North Carolina will remain open in beneficial service to their communities." N.C.G.S. § 131E-192.1(4). Under the COPA, with state approval and under close regulatory scrutiny, Mission Hospital merged with Asheville's St. Joseph's Hospital in 1998, effectively creating a state-sanctioned, single hospital system in Asheville. Following the COPA's

---

[1] The HCA Defendants are HCA Healthcare Inc. ("HCA"), HCA Management Services, L.P., HCA, Inc., MH Master Holdings, LLLP, MH Hospital Manager, LLC, and MH Mission Hospital, LLLP. ANC Healthcare Inc. ("ANC") and Mission Health System, Inc. are also named as defendants and are moving to dismiss the Complaint separately. The HCA Defendants support that motion.

repeal in 2017, Mission has continued providing high quality healthcare to the people of western North Carolina, initially under ANC's stewardship, and later under HCA's ownership following its acquisition of Mission in 2019.

In their Complaint, Plaintiffs ignore the last 20-plus years of Mission's history and the legitimate foundations for its success. Plaintiffs allege that as a result of the COPA, Mission obtained "monopoly power" over general acute inpatient services ("GAC services") in the "Asheville Region" (Buncombe and Madison counties), and has, since at least 2017 (if not earlier), unlawfully wielded that legitimately-obtained power to extract a "web" of contractual concessions from commercial insurers and self-funded health plans (collectively, "commercial insurers"). According to Plaintiffs, these alleged contractual provisions have allowed Mission to charge supra-competitive prices and reduce quality of care for GAC and outpatient services in both the Asheville Region and "Outlying Regions" (Macon, McDowell, Mitchell, Transylvania, and Yancey counties) and to exclude competition for those services in those regions, in violation of Sections 1 and 2 of the Sherman Act.

This action is the most recent in a spate of (largely unsuccessful) antitrust lawsuits filed against hospital systems nationwide alleging that they have engaged in similar practices.[2] Perversely, the effect of these lawsuits is to increase hospitals'

---

[2] *See, e.g.*, *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, 376 N.C. 63, 98 (2020); *Sidibe v. Sutter Health,* No. C 12-04854 LB, 2013 WL 2422752, at *14 (N.D. Cal. June 3, 2013).

cost of doing business in the form of high litigation expenses. As the Supreme Court put it in *Twombly*, defending an antitrust lawsuit—even a baseless one—is "a sprawling, costly, and hugely time-consuming undertaking." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 560 n.6 (2007). To protect defendants against this "potential enormous expense," courts must "tak[e] care" to weed out baseless antitrust suits. *Id*. at 559. This action is just such a baseless lawsuit, and it should be dismissed for at least the following reasons:

***First***, Plaintiffs' Section 2 Monopolization claim should be dismissed because Plaintiffs fail to plead facts demonstrating that Mission unlawfully obtained or maintained monopoly power over GAC or outpatient services in any market. For GAC services, Plaintiffs rely on current market-share data, but that data is consistent with, and indeed explained by, Mission's lawfully-obtained market share as a result of the COPA. Indeed, such allegations do not plead a violation of Sherman Act Section 2 because firms with alleged monopoly power are allowed under federal law to charge higher prices or reduce output. Thus, Plaintiffs' anecdotes about allegedly higher prices for select Mission services, or doctors leaving Mission's network, fall far short of stating a claim against Mission.

***Second***, the case should be dismissed because the Complaint fails to allege facts showing that Mission engaged in the anticompetitive conduct that forms the basis of Plaintiffs' Section 2 Monopolization and Section 1 Restraint of Trade

claims. The Complaint does not allege that any complained-of provision is actually found in any contract with any commercial insurer, much less how such provisions restricted competition from other healthcare providers, or how they harmed health plans like the Plaintiffs. These omissions are all the more glaring considering that Plaintiffs provide their own self-funded health plans and seek to represent a class of commercial insurers who, like Plaintiffs, are the counterparties to the contracts containing the allegedly problematic provisions. As such, Plaintiffs' inability to muster factual allegations about the contractual provisions, the supposed effects those provisions had on competition between healthcare providers or payers, or any other form of exclusionary or anticompetitive conduct dooms them from the start.

*Third*, Plaintiffs' Section 1 Restraint of Trade claim should be dismissed because Plaintiffs fail to allege that a substantial portion of the market is foreclosed by the challenged contracts between Mission and commercial insurers. To plead a Section 1 claim in the context of a vertical agreement, a plaintiff must plead that at least 30%-40% of the market has been foreclosed. Here, there are no allegations that competitors were unable to compete or provide services in the relevant markets. Nor are there allegations about potential competitors who decided not to enter or add services to these markets. Plaintiffs' anecdotes about reduced output and supposedly higher prices for select Mission services do not plead anti-competitive conduct, and certainly not anti-competitive effects.

Accordingly, and as discussed more fully below, Plaintiffs have failed to allege facts sufficient to sustain their claims, and this action should be dismissed.

## FACTUAL ALLEGATIONS AND BACKGROUND[3]

### A.    The HCA Defendants.

Mission's first facility, Mission Hospital, was established nearly 130 year ago to provide "charity care to Asheville's sick and poor." ¶ 60.   Mission Hospital subsequently partnered and merged with other community hospitals to form Mission, which currently consists of six hospitals and other ancillary facilities. Mission is an integrated system, providing comprehensive inpatient and outpatient medical services in multiple counties across Western North Carolina. ¶¶ 61-63.

HCA owns and operates over 200 hospitals in 21 states. ¶¶ 28, 30, 32.  In January 2019, HCA acquired Mission's assets pursuant to an amended Asset Purchase Agreement  ¶¶ 29, 35, 77.  As part of that acquisition, Mission and HCA worked with the Attorney General and, at his request, made commitments to the citizens of North Carolina, memorialized in their asset purchase agreement.  ¶ 183.[4]

### B.    The Plaintiffs.

---

[3] The facts below are taken from the Complaint (Dkt. No. 43), the well-pled allegations of which are assumed are true, as well as public materials as to which this Court may take judicial notice.  Complaint citations are reflected as "¶ __".

[4] *See also* Press Release, N.C. Dep't of Justice, Attorney General Josh Stein Does Not Object to Mission/HCA Deal (Jan. 16, 2019), https://ncdoj.gov/attorney-general-josh-stein-does-not-object-to-mis-d1/ [https://perma.cc/5Q2T-QSXD].

5

Plaintiffs are the Cities of Brevard and Asheville, and Counties of Madison and Buncombe. Each has a self-funded health plan for its employees. ¶¶ 24-27. Plaintiffs seek to represent a class of similarly situated entities defined as "all insurers and health plans that paid for GAC Services and/or outpatient Services in the Asheville Region and/or the Outlying Regions directly from one or more Defendants at any time during the period from June 3, 2018 up to the time the alleged ongoing anticompetitive conduct has ceased (the 'Class Period')." ¶ 192.

**C.    Summary of Plaintiffs' Allegations.**

Plaintiffs allege that Mission lawfully obtained monopoly power in the Asheville Region GAC services market under the COPA, and contend that Mission has maintained a monopoly in the alleged Asheville Region GAC services market since at least the 2017 repeal of the COPA. ¶¶ 92, 129, 147-48. Plaintiffs also allege that Mission leveraged its supposed monopoly power in the Asheville Region GAC services market to monopolize the markets for outpatient services in both the Asheville and Outlying Regions. ¶ 146. According to Plaintiffs, Mission's ability to charge "supracompetitive prices" as compared to other healthcare providers in North Carolina demonstrates monopoly power. ¶ 12.

Plaintiffs' claims are based on provisions it believes are in contracts between Mission and various commercial insurers. According to Plaintiffs, these alleged contract provisions require insurers to contract with all Mission hospitals for GAC

6

and outpatient services ("all-or-nothing provisions"); prevent insurers from steering away from Mission hospitals ("anti-steering" provisions); and maintain the confidentiality of Mission's contract prices. ¶¶ 88, 124-149.

Despite the fact Plaintiffs have their own self-insured health plans—and purport to represent commercial insurers who contract directly with Defendants—the Complaint fails to allege any specific contractual provision or specific contractual negotiation that violates the antitrust laws. Moreover, while the Complaint vaguely asserts that these contractual provisions exist, it never alleges any anticompetitive effects stemming from a specific clause or any actual insurer forced to accept the alleged provisions. At best, the Complaint alleges contractual clauses that *may* exist and *may*, in theory, have anticompetitive effects.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Legal conclusions must be supported by factual allegations that amount to more than unadorned, the-defendant-unlawfully-harmed-me accusations." *Williams v. Ests. LLC,* No. 1:19-CV-1076, 2020 WL 887997, at *9 (M.D.N.C. Feb. 24, 2020) (quoting *Iqbal*).

In antitrust cases in particular, a plaintiff "must plead facts sufficient to identify each element of the antitrust violations, and the allegations must be stated

in terms that are neither vague nor conclusory." *Id*. Because of the "enormous expenses in discovery" in antitrust actions, the Court must "tak[e] care to require allegations that reach the level suggesting conspiracy." *Twombly*, 550 U.S. at 559. *See also Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221 (4th Cir. 1994) ("[I]t is not, however, proper to assume that plaintiffs can prove facts that they have not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.").

This means that "[t]o state a claim under Section 1 of the Sherman Act, plaintiffs must allege facts" that show "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint on trade." *D&M Farms v. Birdsong Corp.*, No. 2:19-CV-463, 2020 WL 2501444, at *2 (E.D. Va. May 14, 2020). To adequately allege an "unreasonable restraint on trade," the plaintiffs must "allege facts which, if true, would establish" that the restraint in unreasonable, either *per se* or under the rule of reason. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 212 (4th Cir. 2002). And "to state a claim of actual monopolization under section 2 of the Sherman Act," the plaintiff must allege facts that show "[1] possession of monopoly power in a relevant market, [2] willful acquisition or maintenance of that power in an exclusionary manner, and [3] causal antitrust injury." *Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*, 2015 WL 5712640, at *10 (M.D.N.C. 2015).

8

# **ARGUMENT**

Plaintiffs attempt to plead two Sherman Act claims: a Section 2 claim for monopolization, and a Section 1 claim for unreasonable restraint of trade. ¶ 1. Both fail for a host of reasons.

For the Section 2 monopolization claim, Plaintiffs needed to allege that Mission has monopoly power and that it acquired or maintained that power through anticompetitive conduct. But the Complaint admits that Mission acquired its (purported) GAC monopoly power lawfully and fails to show that Mission maintained that power through any anticompetitive conduct. And the Complaint fails to allege that Mission even has monopoly power in the outpatient market, let alone that it engaged in anticompetitive conduct to get or keep that power.

In fact, the Complaint fails to identify *any* specific conduct that could give rise to *any* Sherman Act claim. Section 1 and Section 2 claims both require the plaintiff to allege specific anticompetitive conduct. Plaintiffs' only effort to allege anticompetitive conduct is to claim, in conclusory terms, that unidentified contracts with unnamed insurers contain unspecified anticompetitive language. These vague gestures toward contractual provisions that may or may not exist are insufficient to state a Section 1 or Section 2 claim.

Finally, the Section 1 claim fails even if the Complaint adequately alleged the anticompetitive contract provisions. Those provisions are not *per se* unreasonable,

9

and the Complaint fails to show that they foreclosed a substantial share of the relevant markets and, therefore, are unreasonable under a rule-of-reason analysis.

## I.    The Complaint Fails To Allege Defendants Unlawfully Obtained or Maintained a Monopoly.

The thrust of Plaintiffs' complaint is that Mission supposedly engaged in exclusionary, unlawful conduct by supposedly foisting onto commercial insurers "all-or-nothing", "anti-steering", and price confidentiality provisions.  Beyond this, the Complaint is vague as to its theory.  As discussed below, Plaintiffs' monopolization claim fails because Plaintiffs have not alleged that Mission *unlawfully* obtained or maintained monopoly power in any market.  In fact, their allegations show that Mission lawfully obtained and maintained monopoly power as a result of the COPA.

### A.    The Complaint Fails To Allege That Mission Unlawfully Obtained or Maintained Monopoly Power for GAC Services.

#### 1.    The Complaint's Market Share Data Are Insufficient.

The Complaint claims to identify Mission's current market share for GAC services in each county in the Asheville and Outlying Regions and alleges that this is evidence of Mission's unlawful monopolization of those services in those regions. ¶¶ 146-48.  Not so.  The law is very clear that having high market shares or alleged monopoly power is not itself unlawful.  *See Pac. Bell Tel. Co. v. linkLine Communs., Inc.*, 555 U.S. 438, 454-55 (2009) ("The mere possession of monopoly power, and the concomitant changing of monopoly prices, is not only not unlawful; it is an

10

important element of the free-market system.").  It is only where a monopoly is *unlawfully* obtained (or maintained) through exclusionary conduct that a claim arises.  *See Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, No. 319CV00515KDBDSC, 2022 WL 2293908, at *6 (W.D.N.C. June 24, 2022) .  The Complaint fails in that regard.

The most problematic aspect of Plaintiffs' claim that "market share" alone demonstrates unlawful monopoly acquisition is that it completely ignores, and cannot overcome, the Legislature having bestowed the COPA on Mission ***in 1995*** that allowed it, lawfully ***and over the course of 22 years***, to obtain whatever market shares that it allegedly maintains to this day.  Indeed, the Complaint pleads that as a result of the COPA, Mission lawfully obtained monopoly power in and around the Asheville area through acquisitions and mergers with competitors throughout western North Carolina, including in counties that make up the "Outlying Regions".  *See* Compl. § IV.A ("Mission acquired monopoly power under the COPA.").  Thus, allegations that Mission continues to have significant market shares in (or, using the Complaint's conclusory term, "monopoly power" over), GAC services, when the COPA expired only five years ago, plainly does not suggest the existence of unlawful, exclusionary conduct to maintain that lawfully-obtained monopoly power.  *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, (2004) (dismissing monopolization claims against Verizon when it had lawfully

obtained its monopoly power "by establishing an infrastructure that renders them uniquely suited to serve their customers."). Such is the type of data that the Supreme Court explained in *Twombly* are consistent with lawful behavior, and does not adequately allege an antitrust claim. *See Twombly*, 550 U.S. at 554 (dismissing complaint because it alleged behavior "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy").[5]

2.      Plaintiffs' Other Allegations Do Not Plead That Mission Unlawfully Maintained Monopoly Power.

Having conceded that Mission lawfully obtained its purported monopoly power over GAC service as a result of the COPA, the Complaint does not, and cannot adequately allege that Mission unlawfully *maintained* that monopoly power through exclusionary conduct.[6] While the Complaint alleges that some sort of exclusionary conduct (and monopoly power) can be inferred because Mission is able to "charge supra-competitive prices, reduce output, and decrease the quality of services" ¶ 116, those activities are all equally consistent with Mission having lawful monopoly power during the COPA period. Indeed, one of the expected and legally-approved

---

[5] Tellingly, Plaintiffs do not allege that Mission's market share for GAC services increased post-COPA or even after June 2018 when the Class Period began.

[6] To the extent the Complaint could be read as alleging that HCA unlawfully maintained monopoly power as a result of its acquisition of Mission, such an allegation would fail given that HCA was not competing in western North Carolina to begin with. *See Tops Mkts. Inc. v. Quality Mkts., Inc*., 142 F.3d 90, 96 (2d Cir. 1998) ("[E]ven if plaintiff were hindered from competing, nothing changed in the relevant product market from the consumer's prospective.").

12

consequences of having lawful monopoly power is being able to set higher prices. *See Pac. Bell Tel. Co.*, 555 U.S. at 454-55 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486 (6th Cir. 2021) ("By themselves, possessing monopoly power and charging monopoly prices do not violate § 2.").

Moreover, there are no factual allegations that the supposed anti-competitive "effects" that the Complaint observes, such as supposedly higher prices, decreased quality of care, or reduced output are connected in any way to the complained-of contractual provision (even assuming they exist in Mission's contracts with commercial insurers), let alone that they allowed Mission to keep or maintain market power to the exclusion of competitors. For example, Plaintiffs do not allege that the higher prices that Mission supposedly charges, on average, for "C-Sections without complications," ¶ 157, or the fact that 79 doctors have left the Mission system, *see* ¶¶ 157, 172, are the result of any specific "all-or-nothing," "anti-steering" or price confidentiality clause, much less that any of that allowed Mission to keep whatever market power it had. This is fatal to Plaintiffs' monopolization maintenance theory. *Sidibe*, 2013 WL 2422752, at *14 (allegations that hospital's "tying" and exclusive dealing provisions "dramatically increased prices" were "conclusory" and "do not show predatory conduct resulting in or enhancing monopolization.").

**B. The Complaint Fails to Allege That Mission Unlawfully Obtained or Maintained Monopoly Power for Outpatient Services.**

The Complaint also fails to adequately allege that Mission held, let alone maintained, monopoly power over outpatient services in either the alleged Asheville or Outlying Regions. The Complaint concedes that there are no market data to support Plaintiffs' allegations of monopoly power for outpatient services besides ambulatory surgical services. ¶ 116. Instead, it relies on the same anecdotes that it does for inpatient services about supra-competitive prices, reduced quality, and reduced output. ¶ 117. In most instances, the Complaint's anecdotes are specific to inpatient, rather than outpatient services, ¶ 146, and are therefore irrelevant to assessing the Complaint's outpatient monopolization claims as to outpatient services in the Asheville or Outlying Regions. *Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 434 (M.D. Pa. 2003) (noting that market power over "general inpatient facilities services market" cannot be used to demonstrate market power over "inpatient eye surgery facility services," because such services are not interchangeable). Regardless, the anecdotes that the Complaint provides are untethered to any unlawful, exclusionary conduct, much less to the maintenance of any monopoly power in the Outlying Regions.

**II. The Complaint Alleges No Exclusionary, Anticompetitive Conduct.**

The Complaint should also be dismissed because it alleges no exclusionary, unlawful conduct to support its Section 2 Monopolization and Section 1 Restraint of

14

Trade claims. The crux of Plaintiffs' case is that Mission supposedly leveraged its lawfully-obtained monopoly power over GAC services in the alleged Asheville area to impose upon commercial insurers "all-or-nothing", "anti-steering", and price confidentiality provisions that Plaintiffs contend stifle competition. ¶¶ 122, 127. While Plaintiffs devote over a dozen paragraphs in the Complaint to explaining why these provisions in commercial health insurance contracts are supposedly problematic *in general*, conspicuously absent are factual allegations suggesting that Mission's contracts with commercial insurers actually include any of these provisions and that any payers, patients or healthcare providers were forced to take or prohibited from taking any actions.[7] This information, if it existed, should be within Plaintiffs' fingertips. Indeed, the Complaint alleges that Plaintiffs have self-funded health plans for their employees and seek to represent a class of commercial insurers who, like Plaintiffs, supposedly were on the receiving end of these

---

[7] The closest the Complaint comes to pleading facts about a specific insurer and a specific contract is when it vaguely alleges that in 2017 "Blue Cross Blue Shield" **did "not agree** to Mission's 'all or nothing' demand, and Mission went out of "the Blue Cross network." ¶ 126 (emphasis added). While the Complaint alleges that Blue Cross eventually "capitulated," it does not allege that the parties' negotiated resolution involved anticompetitive conduct, only that Blue Cross agreed to a rate increase and inclusion of the entire Mission health system, which is not necessarily the same as an "all or nothing," "tying" or other challenged contractual provision. ¶ 127. Moreover, these allegations pre-date HCA's acquisition of Mission and do not suggest that the HCA Defendants are subject to liability relating to those negotiations. Furthermore, these allegations are not actionable because they involve conduct that pre-dates the four-year statute of limitations.

15

contractual provisions. *See* ¶¶ 24-27.

Whatever the reason for these omissions, they are significant—and fatal. The law is very clear that to plead a Sherman Act claim based on these types of contractual clauses, a plaintiff "must identify some specific tying" that occurred, *Adelphia Recovery Trust v. Bank of Am., N.A.*, 646 F. Supp. 2d 489, 494 (S.D.N.Y. 2009) (dismissing tying claim for this reason), and provide some level of detail as to what products were tied, in what contracts, and when. *See, e.g.*, *Wholesale Alliance, LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069, 1079-80 (E.D. Mo. 2019) (dismissing tying claim because plaintiff "has not pled the existence of an explicit agreement conditioning the purported tying produced (access to Express Scripts' network) on the purchase of the purported tied product"); *Sidibe,* 2013 WL 2422752, at *14 (tying arrangement insufficiently pled).[8]  This information is vital, because without it Defendants (and the Court) are left to guess, among other things, what specific provisions were forced upon large, sophisticated players like Blue Cross Blue Shield, Cigna, Humana, and others, and what impact, if any, each of those provisions has had on competition in each market.

For example, the Complaint provides no indication how those contractual

---

[8] *Accord Banxcorp v. Bankrate, Inc.*, 2008 WL 5661874, at *5 (D.N.J. July 7, 2008) (tying claim dismissed because "Plaintiff has not adequately set forth any conditional agreement between [defendants] which would evidence a general tying scheme."); *Twombly*, 550 U.S. at 565 n.10 (complaint defective because it "mentioned no specific time, place, or person involved" in alleged conspiracy).

provisions (even if they exist in Mission's contracts) operated in practice for each contract, including what specific Mission services were tied, how insurers and/or patients and physicians were prohibited (if at all) from seeking services from other providers, and what pricing information insurers could not disclose. In this regard, it is important to note that the Complaint does ***not*** plead that the alleged contractual provisions forced any insurer to exclude from its network any Mission competitor or service that it provides; precluded any insurer from forming networks that favor, or steer patients to, other providers over Mission; forced any patient, employer or physician either to purchase any plan that included, or to use, Mission's facilities or services; or forced any Mission competitor from doing anything differently than before in terms of cost of or access to, their services, among other things.

Given this, it is not apparent what is so problematic about the "all-or-nothing", anti-steering, and price confidentiality provisions that are allegedly in Mission's contracts. *See Sidibe*, 2013 WL 2422752, at *14 (finding similar provisions in hospital-insurer contracts not to be anti-competitive and noting that such provisions are "managed care"). Allowing Plaintiffs to get past the pleadings and into discovery on such a flimsy foundation would run counter to *Twombly*'s instruction to dismiss cases that are based on a legal theory in search of a factual predicate.

This case is best analogized to the *Sidibe* decision where the court dismissed similar restraint-of-trade and monopolization claims for lack of specific factual

content, *Sidibe*, 2013 WL 2422752, at *14, rather than to *Charlotte-Mecklenburg Hospital Authority* ("*Atrium*") cited in the Complaint. ¶ 123. In *Atrium*, the complaint gave detailed descriptions of anticompetitive provisions in specific contracts with named insurers and showed that those provisions actually inflicted an identifiable harm on consumers (they prevented insurers from being able to create innovative, lower-cost health plans that favored Atrium's competitors). *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 729, 731 (W.D.N.C. 2017). In *Sidibe*, the complaint described "exclusivity" and "all-or-nothing" provisions in similar detail but failed to allege that defendant's contractual provisions amounted to impermissible tying arrangements when patients were free to seek services from other providers. *Id*. at *14. This doomed the *Sidibe* plaintiffs' claims at the pleading stage. *Id*.

Plaintiffs here give even less detail than in *Sidibe*—they fail to describe the purportedly anticompetitive provisions in any detail or to allege that those provisions are actually in any contracts, let alone that those provisions worked any harm to consumers or competitors. Thus, the Complaint here too should be dismissed.

## III. The Complaint Fails to Adequately Allege That the Challenged Conduct Substantially Affected Competition.

To state a restraint of trade claim under Section 1 of the Sherman Act, Plaintiffs must allege, among other things, a restraint on trade that substantially impacts competition. *See D&M Farms,* 2020 WL 2501444, at *4. As discussed

18

below, the Complaint fails in this regard and, accordingly, the Section 1 claim should be dismissed.

### A.    The Rule of Reason Applies.

The alleged restraints pled in the Complaint—"all-or-nothing" arrangements, anti-steering clauses, and price confidentiality provisions—are all examples of vertical restraints subject to a rule of reason analysis. *See Con'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–55, 59 (1977) (applying rule of reason to vertical restraints). These types of provisions are not uncommon in commercial healthcare contracts, *see*, *e.g.*, *Sidibe*, 2013 WL 2422752, at *14, and provide procompetitive benefits, as courts have consistently recognized. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895 (9th Cir. 2007) (noting benefits of all-or-nothing provisions because buyers get discounts that allow them "to get more for less"); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992) (noting all-or-nothing provisions "may serve procompetitive purposes, such as quality control, production and sales efficiencies, and facilitation of indirect price competition"). For benefits of anti-steering provisions, *see Barry v. Blue Cross of Cal.*, 805 F.2d 866, 872 (9th Cir. 1986) (anti-steering provisions expand patient choice and access). For benefits of confidentiality provisions, *see Water Transp. Ass'n v. Interstate Commerce Com.*, 722 F.2d 1025, 1032 (2d Cir. 1983) (confidentiality provisions prevent the "public disclosure of contract terms [which]

can undermine competition by stabilizing prices at an artificially high level");; *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) ("[I]nferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition.")..

Under the rule of reason, the plaintiff bears the initial burden of showing that the challenged action has had "an actual adverse effect on competition as a whole in the relevant market." *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380 (M.D.N.C. 2002). To do so, Plaintiffs can either: (1) allege "an actual adverse effect on competition, such as reduced output" or (2) indirectly allege an adverse effect by claiming market power as "a proxy for adverse effect." *Tops Mkts. Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96-97 (2d Cir. 1998). Thus, for each purportedly anticompetitive contract, Plaintiffs must allege an adverse impact on competition that goes beyond a theoretical claim of potential impact. Plaintiffs must also plead the absence of procompetitive effects that outweigh any adverse effect on competition. *See Int'l Const. Prod. LLC v. Caterpillar Inc.*, 2016 WL 264909, at *7 (D. Del. Jan. 21, 2016) (dismissing complaint that failed to allege "harm to the competitive process itself"); *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-CV-01241-JLK, 2010 WL 1416823, at *13 (D. Colo. Apr. 7, 2010) (dismissing complaint because "[e]ven if Plaintiffs adequately pled the existence of a horizontal agreement … I find it likely that the procompetitive effect of those agreements

20

outweighs any potential repugnance").

**B.** **The Complaint Fails to Allege with Direct Evidence That the Offending Contractual Terms Harmed The Market As a Whole.**

Plaintiffs fail to allege that the purported tying arrangements, anti-steering and price confidentiality provisions (assuming they exist) have had an adverse effect on the relevant markets as a whole. *See Okasen v. Page Memorial Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (dismissing antitrust claim because "there is no evidence that competition as a whole in the relevant market has been harmed"). Simply, there are no factual allegations that competitors have been marginalized or that would-be competitors are barred from entry due to these contractual provisions. Alleging generally, as the Complaint does, that these provisions are bad for competition is insufficient. *See TechReserves Inc. v. Delta Controls Inc.*, No. 13 CIV. 752 GBD, 2014 WL 1325914, at *9 (S.D.N.Y. Mar. 31, 2014) ("[A]n antitrust defendant charged with illegal tying is entitled to some specificity as to the conduct alleged to be coercive, the customers who would have purchased a product elsewhere but for the coercion, the particular products sold as a result of the coercion, the anti-competitive effects in a specified market, and the effect on the business of the plaintiff.") (internal quotations omitted); *Sidibe*, 2013 WL 2422752, at *14 (same).

That is all the more true here considering that the allegedly offending contractual terms are known to have *procompetitive benefits*. *See* Part III.A, *supra*. Thus, it is not enough for Plaintiffs to conclusorily allege that "Defendants have

limited health plans' ability to use steering or tiering language" which hurts competition because a "plan's use of steering can foster health competition between providers and encourage the growth of new providers," ¶¶ 133, 136, or that price confidentiality provisions "impair the ability of rival providers both to attract business and for health plans to assemble the highest quality, lowest cost menu of in-network providers." ¶ 145. These vague claims are insufficient, particularly when juxtaposed with the procompetitive benefits that the alleged contractual provisions offer. *See, e.g., Sidibe,* 2013 WL 2422752, at *14 (allegations that hospital's "tying" and exclusive dealing provisions "stifles competition" and "dramatically increased prices" were "conclusory" and did not adequately plead that such provisions had an anticompetitive effect "on more than an insubstantial volume of commerce.")*; see also King Drug Co. of Florence Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 413 n.38 (3d Cir. 2015) (holding a defendant may "prevail on a motion to dismiss … if, for example, there is no dispute that, under the rule of reason, the procompetitive benefits … outweigh [] alleged anticompetitive harm.").

Plaintiffs also attempt to allege substantial competitive harm through decreased service quality, reduced output, and increased costs of certain services. But the Complaint provides nothing more than anecdotes about, for example, how Mission's Medicare prices generally and commercial prices for particular GAC and outpatient procedures like "for C-Sections without complications" and "CT scans"

22

at specific Mission facilities (like "Mission Hospital-McDowell") are higher than the state average, or how 79 unidentified "doctors had left or planned to leave the [Mission] system since HCA's takeover", or how Mission has closed unidentified "outpatient rehabilitation clinics in Candler and Asheville". ¶ 169. Of course, higher prices alone are not indicative of anti-competitive conduct, s*ee Leegin Creative Leather Prods. v. PSKS, Inc*., 551 U.S. 877, 896-97 (2007), and none of these anecdotes is connected to (let alone alleged to result from) the challenged conduct or come close to pleading that competition has been meaningfully stifled or impacted as a result. *See In re Aluminum Warehousing Antitrust Litig*., No. 13-MD-2481 KBF, 2014 WL 4277510, at *21 (S.D.N.Y. Aug. 29, 2014) (dismissing complaint for failing to allege antitrust injury and stating: "[t]hat [defendants] were harmed by paying higher prices they have alleged—and they have done so clearly. But how that impacted competition and in which market is not.").

Moreover, these supposed anticompetitive "effects" even fail on their own terms. For example, the Complaint cherry-picks particular services and claims that the prices Mission charges are "supracompetitive."[9] But most of the price data that

---

[9] While defining the relevant service markets to consist of GAC and, separately, outpatient services, each as a bundle of services, the Complaint frequently resorts to alleging supposedly higher prices charged by Mission for particular services within the bundles as compared to prices charges by hospitals for the same services throughout the state, rather than within the relevant geographic markets. Such allegations are irrelevant given how Plaintiffs have defined their markets.

Plaintiffs rely upon is from ***Medicare***, which the Complaint alleges is irrelevant, ¶ 91, and which cannot show that Mission charged supracompetitive prices in its contracts with commercial insurers. *See Methodist Health Servs. Corp. v. OSF Healthcare*, No. 113CV01054SLDJEH, 2016 WL 5817176, at \*9 (C.D. Ill. Sept. 30, 2016), *aff'd* 859 F.3d 408 (7th Cir. 2017) (noting that "government payers pay significantly less than commercial payors" and therefore excluding government payers from class because "medical bills charged to commercial and public players are markedly different.").[10]

### C. The Complaint Fails to Allege With Indirect Evidence That A Substantial Volume of Commerce Was Foreclosed.

Plaintiffs also fail to allege that the offending provisions foreclosed substantial competition indirectly through market share data. *See Tops Mkts.*, 142 F.3d at 96–97 (noting plaintiffs can indirectly alleged adverse impact by claiming market power as "a proxy for adverse effect."). When relying on such data, courts typically require that plaintiffs show that the unlawful conduct "foreclose[d] at least 30 percent to 40 percent of the market to support a § 1 violation." *Am. Express*

---

[10] *See also Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 997 F. Supp. 2d 142, 161–62 (D.R.I. 2014) (accepting relevant antitrust market that included commercial hospital services but excluded Medicare and Medicaid services because "[v]iewing the product market from the perspective of an aggrieved private purchaser of hospital services, then, it is appropriate to exclude Medicare and Medicaid purchases because the private purchaser was never competing to purchase those services in the first place").

24

*Travel Related Servs. Co. v. Visa U.S.A.*, No. 04 CIV.8967(BSJ), 2005 WL 1515399, at *3 (S.D.N.Y. June 23, 2005); *see also Methodist Health Servs.,* 2016 WL 5817176, at *8 (same) (citing cases).

Here, the Complaint contains no allegations about market share for outpatient services in any of the alleged relevant geographic areas, and alleges only ***current*** market share information for GAC services for certain zip codes in the Asheville and Outlying Regions.  While Plaintiffs allege "on information and belief" that Mission's market shares "have not been materially reduced, and have likely increased, since HCA bought Mission," ¶ 115, such speculation provides no basis for assuming there were any changes in Mission's market share for GAC services, let alone such changes were the actual result of a foreclosure of competition in the market.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

25

Dated: September 9, 2022

Respectfully submitted,

/s/ *Abram Ellis* _____
Sara Razi (admitted pro hac vice)
Abram Ellis (admitted pro hac vice)
SIMPSON THACHER & BARTLETT
LLP
900 G Street NW, Ste. 900
Washington DC, 20001
Phone: (202) 636-5500
sara.razi@stblaw.com
aellis@stblaw.com

Phillip T. Jackson (N.C. Bar No. 21134)
Ann-Patton Hornthal (N.C. Bar No. 35477)
John Noor (N.C. Bar No. 43102)
David Hawisher (N.C. Bar No. 55502)
ROBERTS & STEVENS, PA
P.O. Box 7647
Asheville, NC 28802
Phone: (828) 252-6600
pjackson@roberts-stevens.com
aphornthal@roberts-stevens.com
jnoor@roberts-stevens.com
dhawisher@roberts-stevens.com

*Counsel for the HCA Defendants*