# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

IN RE MISSION HEALTH
ANTITRUST LITIGATION

No.: 1:22-cv-00114-MR-WCM

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS ANC HEALTHCARE, INC. F/K/A MISSION HEALTH SYSTEM, INC. AND MISSION HOSPITAL, INC.

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................... 1

BACKGROUND ............................................................................................. 3

    I.    The ANC Defendants. ......................................................................... 3

    II.   State Oversight of Mission Health under Certificate of Public
          Advantage. ......................................................................................... 5

LEGAL STANDARD ..................................................................................... 8

ARGUMENT ................................................................................................. 9

    I.    The Complaint Does Not Allege that ANC *Unlawfully* Acquired
         Monopoly Power for Inpatient Services in the Asheville Region .......... 9

    II.   Plaintiffs' Claims Against ANC are Limited by the Applicable Statute
         of Limitations. ...................................................................................11

         A.    Dismissal is Appropriate as to the ANC Defendants Due to Lack
              of Allegations between June 2018 and January 2019. ................12

         B.    Plaintiffs' Threadbare Allegations Do Not Constitute Continuing
              Violations. ..............................................................................14

    III.  The Complaint Must Be Dismissed For the Reasons Set Forth In the
          HCA Defendants' Motion to Dismiss. .................................................17

CONCLUSION ..............................................................................................18

# TABLE OF AUTHORITIES

**Cases¶**                                                                    **Page(s)**

*Aurora Enters. v. Nat'l Broad. Co.*,
   688 F.2d 689 (9th Cir. 1982)..........................................................................15

*Barnosky Oils, Inc. v. Union Oil Co. of Cal.*,
   665 F.2d 74 (6th Cir. 1981)............................................................................15

*Bass v. Boston Five Cent Sav. Bank*,
   478 F. Supp. 741 (D. Mass. 1979)................................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................8, 10

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002)...........................................................................8

*Eichman v. Fotomat Corp.*,
   880 F.2d 149 (9th Cir. 1989)..........................................................................15

*Est. Constr. Co. v. Miller & Smith Holding Co.*,
   14 F.3d 213 (4th Cir. 1994)..............................................................................8

*Fairchild v. Kubota Tractor Corp.*,
   No. 1:18-cv-69, 2018 WL 4038126 (W.D.N.C. Aug. 23, 2018).....................12

*Goodman v. Praxair, Inc.*,
   494 F.3d 458 (4th Cir. 2007).........................................................................12

*Info. Exch. Sys., Inc. v. First Bank Nat'l Ass'n*,
   994 F.2d 478 (8th Cir. 1993).........................................................................17

*Irving v. Lennar Corp.*,
   No. CIV S-12-29, 2013 WL 1308712 (E.D. Cal. Apr. 1, 2013).......................16

*Joseph v. Amazon.com, Inc.*,
   46 F. Supp. 3d 1095 (W.D. Wash. 2014) ......................................................16

*Loren Data Corp. v. GXS, Inc.*,
   501 F. App'x 275 (4th Cir. 2012)...............................................................8, 13

ii

*Mason v. Watauga Cnty*,
    No. 5:21-CV-00070-KDB-DSC, 2021 WL 5855661 (W.D.N.C.
    Dec. 9, 2021) ................................................................................7, 8

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009)........................................................7, 8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009).........................................................................9

*Pace Indus., Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987).........................................................15

*Parker v. Brown*,
    317 U.S. 341 (1943).......................................................................10

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987)...................................................12, 15

*Richardson v. Bank of Am., N.A.*,
    182 N.C. App. 531 (2007).............................................................16

*Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co., Inc.*,
    708 F.Supp.2d 257 (E.D.N.Y. 2010) ............................................16

*SaurikIT, LLC v. Apple Inc.*,
    No. 20-cv-08733, 2022 WL 1768845 (N.D. Cal. May 26, 2022) ....16

*Standing Akimbo, LLC v. United States*,
    955 F.3d 1146 (10th Cir. 2020)......................................................4

*United States v. $16,761 in U.S. Currency*,
    No. 5:21-cv-00053-KDB-DCK, 2022 WL 4314460 (W.D.N.C.
    Sept. 22, 2021)................................................................................4

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)........................................................................9

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)............................................................16

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004)...........................................15, 16, 17

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)......................................................................................9, 10

*Witt Co. v. RISO, Inc.,*
    948 F. Supp. 2d 1227 (D. Or. 2013)................................................................16

**Statutes, Rules & Regulations**

15 U.S.C. § 15b .................................................................................................11

N.C.G.S. § 131E-192.1–192.13 ......................................................................4, 5

N.C.G.S. § 131E-192.1(4)...................................................................................5

N.C.G.S. § 131E-192.1(6)...................................................................................5

N.C.G.S. §§ 131E-192.2(2) & 192.3(a)..............................................................5

N.C.G.S. § 131E-192.3(b)...................................................................................6

N.C.G.S. § 131E-192.4(b)...................................................................................6

N.C.G.S. § 131E-192.5 .......................................................................................6

N.C.G.S. § 131E-192.13(a).............................................................................7, 9

Sherman Act (15 U.S.C. §§ 1, 2) ...............................................................*passim*

**Other Authorities**

2013 House of Representatives (2012),
    https://webservices.ncleg.gov/ViewDocSiteFile/43458.....................................6

Letter from Attorney General Josh Stein to Mission Health System
    (Jan. 16, 2019),
    https://ncdoj.gov/download/141/files/12334/nonobjection_letter_-
    _final_-_executed-1.pdf ......................................................................................4

Mission Health, Inc. and Mission Hospital, Inc., Third Amended
    Certificate of Public Advantage Report (Sept. 30, 2017),
    https://info.ncdhhs.gov/dhsr/pdf/copamission2017.pdf ....................................7

# INTRODUCTION

Plaintiffs' Consolidated Class Action Complaint (Dkt. 43) purports to allege that Mission Health System violated Section 1 and Section 2 of the Sherman Act (15 U.S.C. §§ 1, 2) during a putative class period that begins in June 2018. During this period, two distinct groups of Defendants owned the assets of Mission Health—first, prior to the sale of the assets in January 2019, the "ANC Defendants," comprised of ANC Healthcare, Inc. f/k/a Mission Health System, Inc. and Mission Hospital Inc.,[1] and second, the "HCA Defendants," comprised of HCA Healthcare, Inc., HCA Management Services, LP, HCA, Inc., MH Master Holdings, LLLP, MH Hospital Manager, LLC, and MH Mission Hospital, LLLP, which purchased the Mission Health assets from ANC in 2019. For the reasons set forth below and in the HCA Defendants' Memorandum in Support of Motion to Dismiss (Dkt. 45) which ANC incorporates in full, the Complaint fails to state any claim and contains numerous pleading deficiencies, and it should be dismissed against all Defendants. ANC submits this Memorandum separately to identify dispositive issues unique to it as the former owner of the Mission Health assets.

For decades, ANC owned and operated Mission Health as a not-for-profit healthcare system providing high quality services to thousands of patients across

---

[1] As discussed below, the ANC Defendants are the non-for-profit, legacy Mission Health entities that provided healthcare services prior to the sale of Mission's assets to HCA in 2019. Hereafter, we refer to them as "ANC."

western North Carolina. From 1995 through 2017, Mission Health was the subject of a State-issued Certificate of Public Advantage ("COPA"). North Carolina's COPA statute, which is similar to statutes enacted in other states, granted antitrust immunity to certain health care transactions deemed to be in the public interest. In exchange for this immunity, health care providers like Mission Health that were granted a COPA were subject to regulatory oversight by the State to ensure that the benefits of the specific transaction continued to flow to patients. It was under this State COPA oversight that, according to the Complaint, Mission Health acquired its purported monopoly power in the alleged Asheville Region—***lawfully*** and in full cooperation with the State.

Despite acknowledging the history of state immunity because of the COPA in North Carolina, Plaintiffs ignore the implications of it on their claims. Specifically, Plaintiffs complain of a monopoly for inpatient general acute care ("GAC") services in an alleged Asheville Region that was specifically sanctioned and immunized by the State. Plaintiffs then rely on vague, conclusory, "information and belief" allegations that Defendants maintained this monopoly through the use of unspecified contractual provisions with unnamed insurers—such as "all-or-nothing" provisions, "anti-steering"/"anti-tiering" provisions, and confidentiality provisions—that allegedly allowed Mission Health to charge supracompetitive prices and reduce the quality of care. Other than general statements about how these types of provisions

"can" or "may" work in the abstract, Plaintiffs have failed to make any specific allegations about any of these provisions here, despite purporting to represent a class of insurers and health plans who contract directly with Defendants. Even more glaringly, the Complaint never actually alleges or explains how these purported contractual provisions actually affected competition in the relevant geographic markets Plaintiffs allege. These failures are fatal.

The absence of specific allegations of actionable conduct is dispositive of the claims against all Defendants. This failure to meet the requisite pleading standard is even more apparent as to ANC, which controlled the Mission Health assets for ***just eight months of the applicable four-year statute of limitations period***—from June 2018 through January 2019—and which has not provided any inpatient or outpatient services for more than three years. In the absence of specific, plausible allegations as to ANC in this eight-month window, Plaintiffs' claims against ANC should be dismissed.

## BACKGROUND

### I. The ANC Defendants.

ANC Healthcare, Inc., a non-profit corporation, was formerly named Mission Health System, Inc., the parent company that directly and indirectly owned the assets that constituted the health system. As of January 31, 2019, HCA acquired virtually all of those assets of Mission Health from ANC, and HCA—not ANC—currently

operates all Mission Health facilities in North Carolina. *See* Compl. ¶¶ 9, 29, 35, 38–42, 74–77. ANC exists post-sale solely to wind down discrete assets and liabilities relating to Mission Health that did not transfer to HCA in 2019. *See* Compl. ¶¶ 49–55. Since the sale in January 2019, ANC no longer provides healthcare services or operates healthcare facilities.

The proceeds that ANC received from the sale of the Mission Health assets to HCA, approximately $1.5 billion (Compl. ¶ 76), were not to benefit ANC. Rather, by design at closing, ANC is and has been required to deliver those funds to a foundation, the Dogwood Health Trust foundation, a North Carolina not-for-profit corporation created in connection with the sale. The Dogwood Health Trust's sole purpose is to use the proceeds from the sale of the Mission Health assets to benefit the communities ANC once served by making investments to improve the health and well-being of the residents of western North Carolina. *See* Letter from Attorney General Josh Stein to Mission Health System (Jan. 16, 2019), https://ncdoj.gov/download/141/files/12334/nonobjection_letter_-_final_-_executed-1.pdf ("The net assets of Sellers and of Mission Health System Foundation, Inc. will be transferred as quickly as is prudently possible to Dogwood Health Trust ('Dogwood'), a new North Carolina charitable corporation.").[2]

---

[2] This Court may take judicial notice of relevant government publications. *United States v. $16,761 in U.S. Currency*, No. 5:21-cv-00053-KDB-DCK, 2022 WL

## II.    State Oversight of Mission Health under Certificate of Public Advantage.

From 1995 through 2017, while owned by ANC, Mission Health was regulated by the State of North Carolina pursuant to the COPA statute. N.C.G.S. § 131E-192.1–192.13; Compl. ¶¶ 7, 64, 73. That legislation was originally enacted in 1993 and allowed the State to confer antitrust immunity to healthcare transactions that met certain regulatory thresholds and that were designed to benefit patients in the state. N.C.G.S. §§ 131E-192.2(2) & 192.3(a); Compl. ¶ 62.

The COPA statute's purpose was to encourage "cooperative agreements among hospitals" to "foster improvements in the quality of health care for North Carolina citizens, moderate increases in cost, improve access to needed services in rural areas of North Carolina, and enhance the likelihood that smaller hospitals in North Carolina will remain open in beneficial service to their communities." N.C.G.S. § 131E-192.1(4); *see also* N.C.G.S. § 131E-192.1(6) (agreements "that are beneficial to North Carolina citizens despite their potential for or actual reduction in competition" should be "permitted and encouraged"). In 1995, the General Assembly amended the COPA statute to specifically allow mergers of healthcare providers. *See* N.C.G.S. § 131E-192.1–192.13 (amended by S.L. 1995-205, Sec. 1-2, eff. Oct. 1, 1995).

---

4314460, at *2 (W.D.N.C. Sept. 22, 2021) (citing *Standing Akimbo, LLC v. United States*, 955 F.3d 1146, 1152 n.2 (10th Cir. 2020)).

During the existence of the COPA statutory regime, Mission Health expanded through a series of mergers and acquisitions. Mission Hospital first entered into a joint venture and later merged with St. Joseph Hospital in Asheville—a transaction that was approved by the State and which Plaintiffs allege gave Defendants a monopoly for inpatient GAC services in the alleged Asheville Region. Compl. ¶¶ 64–68.[3] Mission Health subsequently merged with five additional smaller, community hospitals, all while subject to continued state COPA oversight: Transylvania Regional Hospital, Angel Medical Center, Highlands-Cashiers Hospital, Mission Hospital-McDowell, and Blue Ridge Regional Hospital. *See* Compl. ¶ 106.

The COPA that the State and Mission Health entered into provided for significant regulatory oversight of Mission Health, as DHHS and the Attorney General were empowered to impose any conditions that they "determine[d] to be appropriate in order to ensure that the cooperative agreement and the activities engaged under it are consistent with this Article and its purpose to limit health care costs." N.C.G.S. § 131E-192.5. For example, the State imposed restrictions on

---

[3] To obtain regulatory approval, the parties submitted an application to the State's Department of Health and Human Services ("DHHS") and to the Attorney General. N.C.G.S. § 131E-192.3(b). After public notice and hearing, DHHS granted a COPA if "an applicant has demonstrated by clear and convincing evidence that the benefits likely to result from the agreement outweigh the disadvantages likely to result from a reduction in competition from the agreement." N.C.G.S. § 131E-192.4(b).

Mission Health regarding its costs, margins, and number of employed physicians it could have. Based on periodic review and reporting, the State concluded that Mission Health complied with those restrictions for the entirety of the COPA's existence. *See* N.C. Gen. Assemb. H. Select Comm. on the Certificate of Need Process and Related Hosp. Issues, Final Report to the 2013 House of Representatives, at 15 (2012), https://webservices.ncleg.gov/ViewDocSiteFile/43458.

In exchange for submitting to this regulatory rigor, entities like Mission Health that were granted a COPA were immunized from state and federal antitrust scrutiny or challenge for "[a]ctivities conducted pursuant to a cooperative agreement for which a certificate of public advantage has been issued." N.C.G.S. § 131E-192.13(a). To be clear, these statutes were not unique to Mission Health, and any health care provider could apply for a COPA under the statute.

In 2016, the statute creating the COPA regulatory regime was repealed by the State. Sec. 12G.4 of S.L. 2016-94, as amended by Sec. 5.7 of S.L. 2016-123; Compl. ¶ 73. Following the repeal, Mission Health was required to submit a final report detailing its compliance with COPA, and it did so on September 30, 2017. Mission Health, Inc. and Mission Hospital, Inc., Third Amended Certificate of Public Advantage Report (Sept. 30, 2017), https://info.ncdhhs.gov/dhsr/pdf/copamission2017.pdf.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12, "a complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Mason v. Watauga Cnty*, No. 5:21-CV-00070-KDB-DSC, 2021 WL 5855661, at *1 (W.D.N.C. Dec. 9, 2021) (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009)). "Plausibility requires that the factual allegations 'be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true.'" *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 279 (4th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court is not required to "accept a complaint's 'legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement.'" *Mason*, 2021 WL 585561, at *1 (quoting *Nemet Chevrolet*, 591 F.3d at 255).

In particular, in an antitrust case, a plaintiff must allege "facts supportive of each element of plaintiff's antitrust claim," and "the allegations must be stated in terms that are neither vague nor conclusory." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 212 (4th Cir. 2002) (quoting *Est. Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 220–21 (4th Cir. 1994)). As the Supreme Court has cautioned, particular care is warranted in antitrust cases, like this one, because "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but

quite another to forget that proceeding to antitrust discovery can be expensive. . . . [A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (citations omitted).

## ARGUMENT

I. **The Complaint Does Not Allege that ANC *Unlawfully* Acquired Monopoly Power for Inpatient Services in the Asheville Region.**

The linchpin of Plaintiffs' Complaint is that Mission Health possesses monopoly power for inpatient GAC services in the alleged Asheville Region (Madison and Buncombe counties). Compl. ¶¶ 112–13. But it is well-recognized that having monopoly power—as Mission Health is alleged to have in the Asheville Region—is not itself unlawful. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 454–55 (2009) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (same).

Rather, to sustain a monopolization claim under Section 2 of the Sherman Act, Plaintiffs must plausibly allege that Defendants *unlawfully acquired* or *maintained* monopoly power through exclusionary conduct. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). But as Plaintiffs themselves acknowledge, the alleged monopoly power that Mission Health purportedly possesses was acquired *lawfully*,

over the course of 21 years, pursuant to the COPA the State entered into with Mission Health in exchange for rigorous regulatory oversight. *See, e.g.*, Compl. § IV.A ("Mission acquired monopoly power under the COPA."); Compl. ¶¶ 64–67; *see also* N.C.G.S. § 131E-192.13(a) (immunizing "[a]ctivities conducted pursuant to a cooperative agreement for which a [COPA] has been issued" from challenge or scrutiny under state and federal antitrust law). During this period, the Mission Health assets were controlled by ANC and its predecessor entities. HCA's acquisition of Mission Health from ANC in 2019 did not occur until after the COPA statutes were repealed by the State in 2017.

By definition, then, Plaintiffs cannot plausibly allege that Mission Health *unlawfully acquired* monopoly power, as the acquisitions creating such alleged power were immunized by state action. *Parker v. Brown*, 317 U.S. 341, 350–51 (1943) (explaining that certain conduct undertaken by a state is entitled to state action immunity from alleged Sherman Act liability).

Nor can Plaintiffs simply presume that Mission Health's continued monopoly power over inpatient GAC services in the alleged Asheville Region has been *unlawfully maintained*, particularly as the COPA statute was repealed only six years ago. *See Trinko*, 540 U.S. at 408–09 (dismissing monopolization claims against Verizon when it had lawfully obtained its monopoly power "by establishing an infrastructure that renders them uniquely suited to serve their customers"). Mission

Health's continued monopoly power is equally consistent with *lawful* behavior, and therefore cannot sustain a claim for the unlawful maintenance of monopoly power in the Asheville Region. *See Twombly*, 550 U.S. at 554 (dismissing complaint because it alleged behavior "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy").

Plaintiffs attempt to eke out a claim that Defendants unlawfully maintained monopoly power in the Asheville Region and expanded (or attempted to expand) that monopoly power to other services and geographic areas through conclusory allegations of anticompetitive insurer contracts. But, as described below and in Section I of the HCA Defendants' Memorandum in Support of Motion to Dismiss, Plaintiffs have failed to plausibly allege any such claim against Defendants, and particularly as to ANC, given the paucity of allegations relating to the eight months before ANC sold the Mission Health assets in January 2019 and exited healthcare.

## II. Plaintiffs' Claims Against ANC are Limited by the Applicable Statute of Limitations.

Alleged violations of Section 1 and Section 2 of the Sherman Act are subject to a four-year statute of limitations. 15 U.S.C. § 15b. Here, the limitations period began on June 3, 2018—four years before the date of the initial Complaint (Dkt. 1) filed in this consolidated matter. *See also* Compl. ¶ 192.

This limitations period is of particular relevance for ANC given how it is uniquely situated in this case. There is no dispute that ANC sold virtually all of the

assets of Mission Health to HCA in January 2019 and, since that date, it has ceased providing inpatient or outpatient healthcare services to the community. Compl. ¶¶ 74–77. Rather, since January 2019, ANC has acted solely as a wind-down entity and as the conduit to deliver the sale proceeds to their beneficial owner, the non-profit Dogwood Health Trust.

Plaintiffs have not made any specific, plausible allegations, as they must to survive dismissal, to state a claim against ANC during the limited period when it owned and operated the assets of Mission Health, from June 2018 through January 2019. The claims against ANC must therefore be dismissed.

### A. Dismissal is Appropriate as to the ANC Defendants Due to Lack of Allegations between June 2018 and January 2019.

A court generally can grant a motion to dismiss on statute of limitations grounds only if the facts necessary to sustain the defense "clearly appear[] on the face of the complaint." *Fairchild v. Kubota Tractor Corp.*, No. 1:18-cv-69, 2018 WL 4038126, at *3 (W.D.N.C. Aug. 23, 2018) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)). The Fourth Circuit has recognized that, in Sherman Act cases, it may be appropriate to dismiss claims based on alleged conduct that occurred outside the limitations period. *See Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987).

Without alleging any specifics as to either contracting parties or contractual terms, Plaintiffs' theory is that Defendants maintained their monopoly power (in

violation of Section 2 of the Sherman Act) and unlawfully restrained trade (in violation of Section 1 of the Sherman Act), by utilizing one or more of these contractual provisions: (a) so-called "all-or-nothing" provisions that obligate commercial insurers to include all Mission Health facilities in their plans; (b) "anti-steering" and "anti-tiering" provisions that limit insurers' ability to incentivize patients to use non-Mission Health facilities; and (c) confidentiality provisions. While these allegations are lacking specifics as to all Defendants,[4] the pleading deficiencies are particularly glaring as to ANC, as the Complaint contains no allegations about *any* such conduct taking place between June 2018 and the sale of Mission Health to HCA in January 2019.[5]

For example, nowhere do Plaintiffs allege the particular insurers with which ANC purportedly implemented or maintained these provisions, when any such contract was signed, or how the provisions actually operated here. General allegations about these broad categories of provisions and how they may have worked in *other* cases or outside of North Carolina, *see* Compl. ¶¶ 83–88, 123, are not "enough to raise [Plaintiffs'] right to relief above the speculative level." *See*

---

[4] *See* Sec. I–II in HCA Defendants' Memorandum in Support of Motion to Dismiss.

[5] The operative Complaint is the fourth antitrust complaint filed against Mission Health in the past year regarding its alleged contracting practices. Given Plaintiffs' failure to offer anything other than general and conclusory allegations, their claims should be dismissed with prejudice and they should not be granted leave to amend.

*Loren Data*, 501 F. App'x at 279.

The one contract Plaintiffs do allege does not rectify this fundamental pleading failure. Plaintiffs allege that Blue Cross, the largest health insurer in North Carolina, accepted a rate increase and an "all-or-nothing" provision in a contract executed sometime in 2017. Compl. ¶¶ 129–30. Even if such broad allegations about one insurer contract were true and otherwise actionable, Plaintiffs still have not stated a claim against ANC *within the applicable limitations period.*[6]

Similarly, the Complaint also lacks any plausible allegations that ANC unlawfully possessed monopoly power either in the Outlying Regions or for outpatient services, or that the alleged contractual provisions (to the extent they exist) resulted in anticompetitive or exclusionary effects. Without allegations of specific conduct as to ANC between June 2018 and January 2019, Counts I and II are barred by the statute of limitations against ANC.

### B. Plaintiffs' Threadbare Allegations Do Not Constitute Continuing Violations.

Not only do Plaintiffs fail to allege *anything* specific as to ANC during the relevant eight-month limitations period, as they must, Plaintiffs also similarly cannot establish that any action that ANC undertook *prior to* June 2018 constitutes a

---

[6] As explained in more detail in Section II.B, the allegations set forth as to this Blue Cross contract do not constitute continuing violations which would extend the statute of limitations.

continuing violation that extends the statute of limitations. *See, e.g.*, Compl. ¶ 12

("[B]eginning in or about 2017, Mission . . . had embarked on a continuing,

multifaceted coercive Scheme designed to foreclose competition from rivals.").

To constitute a continuing violation, an antitrust defendant must perform a

specific "overt act" that restarts the limitations period. *See, e.g.*, *Pocahontas*, 828

F.2d at 218. An "overt act" must: (1) "be a new and independent act that is not merely

a reaffirmation of a previous act;" and (2) "inflict new and accumulating injury on

the plaintiff." *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004)

(quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)).

Importantly, "[a]cts that are merely 'unabated inertial consequences' of a single act

do not restart the statute of limitations." *Id.* (citing *Barnosky Oils, Inc. v. Union Oil

Co. of Cal.*, 665 F.2d 74, 82 (6th Cir. 1981)).

Where contractual arrangements are the basis for an alleged violation of the

Sherman Act (such as the alleged tying and confidentiality provisions with

commercial insurers at issue here, Compl. ¶¶ 119–141), courts have routinely held

that the statute of limitations runs from the execution date of the contract. *See

Varner*, 371 F.3d at 1020 ("Performance of the alleged anticompetitive contracts

during the limitations period is not sufficient to restart the period.") (citing *Eichman

v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989)); *see also Aurora Enters. v.

Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982).

Likewise, when considering the execution and enforcement of an allegedly anticompetitive contract, the execution is deemed the overt act triggering the statute of limitations, while enforcement and later effects of those contracts are mere "reaffirmation[s] of a previous act" that do not trigger a new limitations period. *See, e.g.*, *Varner*, 371 F.3d at 1019. As the Second Circuit recently put it in a Sherman Act case, "[a] contract is a vehicle for determining at the time of contracting what should happen at some time thereafter. So, like the Sixth, Eighth, and Ninth Circuits, we think of the performance of a contract as a manifestation of the 'overt act,' the decision to enter the contract, rather than an independent overt act of its own." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); *see also Varner*, 371 F.3d at 1019–20; *Joseph v. Amazon.com, Inc.*, 46 F. Supp. 3d 1095, 1101 (W.D. Wash. 2014); *Witt Co. v. RISO, Inc.*, 948 F. Supp. 2d 1227, 1235–37 (D. Or. 2013); *Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co., Inc.*, 708 F.Supp.2d 257, 265 (E.D.N.Y. 2010); *Bass v. Boston Five Cent Sav. Bank*, 478 F. Supp. 741, 747 (D. Mass. 1979); *SaurikIT, LLC v. Apple Inc.*, No. 20-cv-08733, 2022 WL 1768845, at *3 (N.D. Cal. May 26, 2022); *Irving v. Lennar Corp.*, No. CIV S-12-29, 2013 WL 1308712, at *15 (E.D. Cal. Apr. 1, 2013).[7] Thus, even if the Complaint had alleged that ANC was responsible for the execution of a contract with

---

[7] This principle is consistent with North Carolina state law and its treatment of limitations questions arising from a contract. *See Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 549–50 (2007).

an insurer before June 2018 that carried into the limitations period (which, to be clear, the Complaint does not), ANC cannot be liable for any "unabated inertial consequences" that occurred afterwards.

This is particularly true where, as here, the Plaintiffs are direct purchasers of Mission Health's services and the putative class members are the counter-parties to the very contractual provisions of which they complain. "[W]hen a complaining party was fully aware of the terms of an agreement when it entered into the agreement, an injury occurs only when the agreement is initially imposed; thus, the limitations period typically is not tolled by the requirements placed on the parties under the agreement." *Varner*, 371 F.3d at 1020 (citing *Info. Exch. Sys., Inc. v. First Bank Nat'l Ass'n*, 994 F.2d 478, 484 (8th Cir. 1993)).

As a result, not only is the lack of allegations in the eight-month limitations window fatal to Plaintiffs' claims, but they also cannot rely on unspecified other contracts executed outside the four-year statute of limitations.

III. **The Complaint Must Be Dismissed For the Reasons Set Forth In the HCA Defendants' Motion to Dismiss.**

With respect to the remaining elements of Plaintiffs' claims, ANC adopts and incorporates the arguments raised in Sections I through III of the HCA Defendants' Memorandum In Support of Dismiss (Dkt. 45).

## CONCLUSION

For the foregoing reasons and those set forth in the Memorandum in Support of the HCA Defendants' Motion to Dismiss, the Consolidated Class Action Complaint should be dismissed as to ANC with prejudice because it fails to allege any claim for which relief can be granted.

Dated: September 9, 2022

Respectfully submitted,

/s/ Dana C. Lumsden
Dana C. Lumsden (N.C. Bar No. 32497)
Anna-Bryce Hobson (N.C. Bar No. 54260)
BRADLEY ARANT BOULT CUMMINGS LLP
214 North Tryon Street, Suite 3700
Charlotte, NC 28202
Telephone: 704-338-6034
Facsimile: 704-332-8858
dlumsden@bradley.com
ahobson@bradley.com

Kenneth M. Vorrasi (admitted *pro hac vice*)
Jonathan H. Todt (N.C. Bar No. 52952)
Alison M. Agnew (admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, D.C. 20005
Telephone: 202-842-8800
Facsimile: 202-842-8465
kenneth.vorrasi@faegredrinker.com
jonathan.todt@faegredrinker.com
alison.agnew@faegredrinker.com

Paul H. Saint-Antoine (admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103
Telephone: 215-988-2700
Facsimile: 215-988-2757
paul.saint-antoine@faegredrinker.com

*Counsel for the ANC Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September, 2022, the foregoing Memorandum in Support of Motion to Dismiss was filed via the Court's CM/ECF filing system, which serves all counsel of record in this matter.

*/s/ Dana C. Lumsden*
Dana C. Lumsden