# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

IN RE MISSION HEALTH
ANTITRUST LITIGATION

No.: 1:22-cv-00114-MR

JURY TRIAL DEMANDED

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE HCA DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................  i

TABLE OF AUTHORITIES .................................................................... ii

I.      INTRODUCTION AND SUMMARY .............................................1

II.     LEGAL STANDARDS ...................................................................7

III.    ARGUMENT...................................................................................8

        A.      Plaintiffs Sufficiently Allege Anticompetitive Conduct......................8

        B.      Plaintiffs Plead HCA's Scheme Maintained Monopoly Power..........17

        C.      Plaintiffs Adequately Plead Anticompetitive Effects ........................20

        D.      HCA's Assertion that its Conduct is Procompetitive is Erroneous ....21

        E.      Plaintiffs Sufficiently Plead Substantial Foreclosure..........................24

IV.     CONCLUSION ............................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
   646 F. Supp. 2d 489 (S.D.N.Y. 2009) ................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................8

*BanxCorp v. Bankrate, Inc.*,
   No. 07-3398, 2008 WL 5661874 (D.N.J. July 7, 2008) ......................................17

*Barry v. Blue Cross of Cal.*,
   805 F.2d 866 (9th Cir. 1986) ................................................................................24

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
   148 F.3d 1080 (D.C. Cir. 1998).............................................................................9

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2007) ................................................................................24

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
   277 F.3d 499 (4th Cir. 2002) ................................................................................22

*Davis v. HCA Healthcare, Inc.*,
   No. 21 CVS 3276, 2022 WL 4354142 (N.C. Super. Sept. 19, 2022) .......... *passim*

*Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*,
   No. 16 CVS 16404, 2017 WL 1359599 (N.C. Super. Apr. 11, 2017) ...... 5, 13, 23

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ................................................................................13

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) .......................................................................... 8, 14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)................................................................................................14

*Faulkner Advert. Assocs., Inc. v. Nissan Motor Corp.*,
   905 F.2d 769 (4th Cir. 1990) ....................................................................... 6, 9, 10

Case 1:22-cv-00114-MR   Document 48   Filed 10/14/22   Page 3 of 33

*Gordon v. Lewistown Hospital*,
   272 F. Supp. 2d 393 (M.D. Pa. 2003)...................................................................20

*Int'l Healthcare Mgmt. v. Hawaii Coal. For Health*,
   332 F.3d 600 (9th Cir. 2003) ...............................................................................23

*King Drug Co. of Florence Inc. v. SmithKline Beecham Corp.*,
   791 F.3d 388 (3d Cir. 2015) .................................................................................23

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022).................................................................19

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc*.,
   981 F.2d 160 (4th Cir. 1992) ..................................................................................9

*Marchbanks Truck Serv., Inc. v. Comdata Network, Inc*.,
   No. 07-CV-1078, 2012 WL 10218913 (E.D. Pa. Mar. 29, 2012) ........................11

*Md. & Va. Milk Producers Ass'n v. United States*,
   362 U.S. 458 (1960)..............................................................................................13

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
   No. 1:13-cv-1054, 2016 WL 5817176 (C.D. Ill. Sept. 30, 2016)........................24

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ............................................................................ 9, 13

*Ohio v. Am. Express Co.*,
   585 U.S. —, 138 S. Ct. 2274 (2018).....................................................................25

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ................................................................................20

*Schuylkill Health Sys. v. Cardinal Health 200, LLC*,
   No. 12-7065, 2014 WL 3746817 (E.D. Pa. July 30, 2014) ..................................11

*Sidibe v. Sutter Health*,
   No. 12-cv-04854-LB, 2021 WL 879875 (N.D. Cal. Mar. 9, 2021) .... 5, 11, 12, 22

*Sidibe v. Sutter Health*,
   *Sidibe*, 2013 WL 2422752 (N.D. Cal. June 3, 2013)............................................12

iii

*Sugar Inst. v. United States*,
    297 U.S. 553, 56 S. Ct. 629 (1936).......................................................................23

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................................20

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992) .............................................................................24

*UFCW & Emp'rs Benefit Tr. v. Sutter Health*,
    2016 WL 3459451 (Apr. 1, 2016) ......................................................... 4, 11, 12

*UFCW & Emp'rs Benefit Tr. v. Sutter Health*,
    2019 WL 3856011 (June 13, 2019) ...................................................... 4, 12, 19, 22

*UFCW & Emp'rs Benefit Tr. v. Sutter Health*,
    No. CGC-14-538451, 2021 WL 5027181 (Cal. Super. Aug. 27, 2021)................4

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016) .............................................................................21

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
    2019 WL 2767005 (W.D.N.C. Apr. 24, 2019) ....................................................5

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
    248 F. Supp. 3d 720 (W.D.N.C. 2017) ...................................................... *passim*

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).........................................................................................13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)........................................................................ 9, 13

*Water Transp. Ass'n v. Interstate Com.*,
    *Comm'n*, 722 F.2d 1025 (2d Cir. 1983).............................................................24

*Wholesale Alliance, LLC v. Express Scripts, Inc.*,
    366 F. Supp. 3d 1069 (E.D. Mo. 2019) ...........................................................16

## Statutes

Sherman Act, 15 U.S.C. § 1...................................................................... *passim*

Sherman Act, 15 U.S.C. § 2...................................................................... *passim*

Case 1:22-cv-00114-MR   Document 48   Filed 10/14/22   Page 5 of 33

# I.    INTRODUCTION AND SUMMARY

This is an antitrust case under Sections 1 and 2 of the Sherman Act against the dominant provider of health care services in Western North Carolina. Plaintiffs are the City of Brevard, Buncombe County, the City of Asheville, and Madison County ("Plaintiffs"). They operate self-funded health insurance plans for their employees. Plaintiffs are suing on behalf of themselves and a class of similarly situated health insurance plans who paid HCA for health care services in the alleged relevant markets (the "Class").[1] Plaintiffs allege that, due to Defendants'[2] anticompetitive conduct, Class members have paid artificially inflated prices for health care services from HCA. HCA owns and operates Mission Hospital-Asheville ("Mission Hospital") and numerous other market-dominant health care facilities in Asheville and the surrounding seven counties in Western North Carolina. ¶¶2, 4-11. HCA's conduct has substantially degraded health care quality, thereby diminishing the quality of life in this region. ¶¶21-23.

---

[1] *See* Consolidated Class Action Complaint, ECF No. 43 ("Complaint") ¶¶3, 192. All ¶__ references are to the Complaint.

[2] Defendants are HCA Healthcare, Inc., HCA Management Services, LP, HCA, Inc., MH Master Holdings, LLLP, MH Hospital Manager, LLC, and MH Mission Hospital, LLLP (collectively "HCA"), and ANC Healthcare, Inc. f/k/a Mission Health System, Inc., and Mission Hospital, Inc. (collectively, "Mission" or "ANC"). Because HCA acquired and now owns the Mission assets, this brief will refer to Defendants collectively as HCA or Defendants.

Plaintiffs allege that HCA illegally maintained and enhanced monopoly power in two health care services markets: (1) the market for inpatient general acute care ("GAC") in hospitals ("GAC Market"), consisting of a broad group of medical and surgical diagnostic and treatment services that include overnight hospital stays ("GAC Services"); and (2) the market for outpatient care ("Outpatient Market"), encompassing all the medical services that are not GAC Services ("Outpatient Services"). ¶¶4, 92-97. Plaintiffs allege that HCA has maintained and enhanced monopoly power in these services markets in two geographic areas: (1) the "Asheville Region," consisting of Buncombe and Madison Counties; and (2) the "Outlying Region," consisting of Macon, McDowell, Mitchell, Transylvania, and Yancey Counties. ¶¶5, 98-110. These services and geographic markets are, collectively, the "Relevant Markets."[3]

HCA dominates health care services in Western North Carolina, especially in the GAC Market in the Asheville Region, where HCA has had a greater than 85% share. ¶¶10, 72, 111-18. HCA controls Mission Hospital, a "must have" GAC Services facility for payers looking to assemble commercially viable provider

---

[3] Before HCA acquired it, Mission came to dominate the Asheville GAC Market through a series of acquisitions under the auspices of a Certificate of Public Advantage ("COPA") granted by the State of North Carolina in 1995. ¶¶7, 61-72. Until it was repealed, effective January 2018, the COPA exempted Mission from antitrust scrutiny but subjected it to price controls. ¶¶66, 68, 71, 114.

networks in Western North Carolina. ¶122. Plaintiffs allege that HCA has monopoly power in each of the Relevant Markets. ¶¶111-118, 150-88.

In short, this case is about HCA maintaining and enhancing its monopoly power by using that power to exploit the inherent disconnect in health care markets between patients (those who use the services) and payers (those who pay and contract for employee health care). ¶¶78, 133. This disconnect means that the primary source of competition for health care comes from the payers, like Plaintiffs here, who contract with networks of providers for a bundle of services to be offered at negotiated contract prices. ¶¶78-82. The insurance networks market to employers a health plan, which includes an "in-network" set of providers whose services are covered by the plan. "Out of network" providers typically are either not covered or require higher co-payments by insureds. ¶¶14, 79-80, 129-30.

Beginning in 2017, Mission (and later HCA) embarked on a three-pronged scheme (the "Scheme") to exploit this disconnect between patients and payers and thereby impair competition. *First*, HCA coerced payers into acceding to its "all or nothing" contractual demands, under which any payer that wanted to include *any* HCA facility in its network was required to include *every* HCA facility. ¶¶125-30. Because of HCA's dominant position in the Asheville GAC Market, payers are thus forced to include all of HCA's facilities "in network." ¶125. *Second*, HCA imposed "anti-steering" and "anti-tiering" clauses in health plan contracts, which

block payers from incentivizing insured patients to use lower cost and higher quality providers within the network. ¶¶131-37. **Third**, HCA coerced payers into accepting "gag clauses." ¶¶17, 138-41. The Scheme caused a precipitous decline in health care quality and artificially inflated prices. ¶¶169, 171-72.

These allegations are sufficient to state claims under Sections 1 and 2 of the Sherman Act. In a string of cases that Defendants anomalously deem "largely unsuccessful,"[4] courts have repeatedly condemned substantially identical conduct as anticompetitive. One such case, brought by a class of health plans just like this one recently settled for $575 million after the plaintiffs defeated summary judgment.[5] Closer to home, the U.S. DOJ resolved an antitrust case against a North Carolina hospital system with a consent decree enjoining the use of anti-steering provisions in *United States v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:16-cv-

---

[4] *See* HCA Defendants' Memorandum in Support of Motion to Dismiss, ECF 45-1 ("Mot.") at 2. Defendants ANC Healthcare, Inc., F/K/A Mission Health System, Inc., and Mission Hospital, Inc. have filed a second motion to dismiss, ECF 47, to which Plaintiffs respond separately ("ANC Opp. Br.").

[5] *See UFCW & Emp'rs Benefit Tr. v. Sutter Health*, No. CGC-14-538451, 2021 WL 5027181 (Cal. Super. Aug. 27, 2021) ("*UFCW III*") (approving $575 million class settlement); *UFCW & Emp'rs Benefit Tr. v. Sutter Health*, 2016 WL 3459451, at *3-4 (Apr. 1, 2016) ("*UFCW I*") (overruling demurrer where plaintiffs had alleged analogous "all-or-nothing, anti-incentive, and price secrecy terms foreclose price competition by rival providers"); *UFCW & Emp'rs Benefit Tr. v. Sutter Health*, 2019 WL 3856011, at *2 (June 13, 2019) ("*UFCW II*") (upholding on summary judgment the plaintiffs' claims that "Sutter [hospital system] use[d] its market power to compel 'Network Vendors' to agree to all-or-nothing, anti-incentive, and price secrecy terms, thereby unlawfully restraining trade and restricting the ability of its competitors to compete in the relevant markets").

4

311-RJC, 2019 WL 2767005 (W.D.N.C. Apr. 24, 2019) ("*Atrium II*"). And, in state court litigation parallel to this action, insured patients recently prevailed on their restraint of trade claim over a motion to dismiss filed by these *same Defendants* in an antitrust lawsuit alleging the *same conduct* brought under North Carolina's antitrust laws. *See Davis v. HCA Healthcare, Inc.*, No. 21 CVS 3276, 2022 WL 4354142 (N.C. Super. Sept. 19, 2022). The *Davis* court relied upon three additional directly relevant cases holding that similar allegations stated claims under federal and state antitrust laws.[6]

HCA makes arguments nearly identical to those that these and other courts have repeatedly rejected. HCA's motion to dismiss hinges on four main contentions. None has merit.

First, as *Davis* recently held, HCA's assertion that Plaintiffs have not sufficiently alleged anticompetitive practices, Mot. at 14-18, is without merit. As in *Davis*, the Complaint here details the precise nature of the anticompetitive conduct,

---

[6] *See Sidibe v. Sutter Health*, No. 12-cv-4854, 2021 WL 879875 (N.D. Cal. Mar. 9, 2021) ("*Sidibe II*") (denying summary judgment in analogous case alleging similar "all or nothing" tying of inpatient and outpatient facilities and anti-steering provisions in provider contracts with health networks as violating Section 1 of the Sherman Act); *Dicesare v. Charlotte-Mecklenburg Hosp. Auth*., No. 16 CVS 16404, 2017 WL 1359599 (N.C. Super. Apr. 11, 2017) (denying motion for judgment on the pleadings in analogous anti-steering and anti-tiering provisions as violating the state analogs to both Sections 1 and 2); *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720 (W.D.N.C. 2017) ("*Atrium I*") (denying motion to dismiss U.S. DOJ's complaint challenging anti-steering provisions under Section 1).

specific instances of HCA engaging in it, and its deleterious effects on competition in the Relevant Markets. HCA chastises Plaintiffs for failing to cite certain specific details regarding the contracts at issue, Mot. at 15, but as HCA well knows *Plaintiffs are not allowed to see the contracts*. In any event, HCA endorses plausibility by admitting that the provisions and practices at issue "are not uncommon in commercial healthcare contracts." Mot. at 19.

Second, HCA claims that the Scheme does not involve exclusionary conduct because HCA did not explicitly require that plans or payers deal exclusively with HCA. Mot. at 16-18. But exclusive dealing is simply one form of exclusionary conduct. As *Davis*, *UFCW*, *Dicesare*, *Sidibe*, and *Atrium* (together, the "Hospital Antitrust Cases") each held, anticompetitive conduct is a far broader than HCA implies, and includes the very tactics alleged here. At root, anticompetitive conduct impairs rivals, not by superior efficiency, but by employing market power to cause market actors "to do something that [they] would not do in a competitive market." *Faulkner Advert. Assocs., Inc. v. Nissan Motor Corp.*, 905 F.2d 769, 772 (4th Cir. 1990). As *Davis* held, the "contractual restrictions at issue" forced insurers into including facilities "that they do not want" in-network, and that such forcing deprived insurers of "the power they would normally be able to exercise in a competitive market to decide which facilities should and should not be included" in-network. *Davis*, 2022 WL 4354142, at *13. This is classic exclusionary conduct.

Third, HCA asserts that it cannot have *maintained* monopoly power illegally where HCA had *acquired* its monopoly power in some of the Relevant Markets legally. Mot. at 11-14. But the Complaint alleges that HCA abused the monopoly power it had acquired while the COPA was in place to *maintain* and *enhance* monopoly power *after* the COPA had expired. As the Hospital Antitrust Cases hold, the restrictions at issue are used by market dominant hospital systems to *maintain* and *enhance* market dominance.

Fourth, HCA's assertion that Plaintiffs have not sufficiently alleged that the Scheme substantially affected competition, Mot. at 18-25, is both erroneous and premature. Plaintiffs have specifically alleged the mechanism by which the Scheme undermined competition in each of the Relevant Markets. ¶¶119-141. And Plaintiffs have alleged the Scheme's market-wide anticompetitive effects. ¶¶142-188. Further, and as this District emphasized in *Atrium I*, determining harm to competition in the healthcare context in particular "is a fact-intensive inquiry," which "requires discovery, and perhaps ultimate decision by a fact-finder." 248 F. Supp. 3d at 729-30.

## II.  LEGAL STANDARDS

The Complaint contains sufficient facts "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Facial plausibility means

allegations that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Atrium I*, 248 F. Supp. 3d at 725 (citing *Iqbal*, 556 U.S. at 678). At the pleading stage, "a judge must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). In antitrust cases, "'dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to' certain types of 'glaring deficiencies,' such as failing to allege a relevant market." *Id.* at 443-44 (quoting *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 339 (D. Vt. 2010)).

## III.   ARGUMENT

### A.   Plaintiffs Sufficiently Allege Anticompetitive Conduct

Defendants argue that the Scheme was not anticompetitive because it did not explicitly prohibit plans or patients from dealing with rivals. Mot. at 16-17. HCA fails to cite a single case supporting its narrow definition of anticompetitive conduct because none does. Instead, the law is clear that "'[a]nticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.'" *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). Conduct is anticompetitive or exclusionary under Sections 1 and

2 where it impairs competition on grounds other than the merits, *i.e.*, other than by offering lower prices, better quality, or superior efficiency.[7] Tying is a specific form of recognized anticompetitive conduct under both Sections 1 and 2.[8]

Thus, HCA's assertion that Plaintiffs fail to allege the Scheme "forced any insurer to exclude from its network any Mission competitor or service that it provides," Mot. at 17, is irrelevant. The pertinent question is not whether the Scheme involved exclusive dealing, but rather whether it undermined competition. Tying, for instance, doesn't operate by barring the purchase of rival products, but instead by "forc[ing] a purchaser to do something that he would not do in a competitive market." *Faulkner*, 905 F.2d at 772. That is precisely what the Scheme does here. Because Mission Hospital is a "must have" hospital, due to the tie, networks had no choice but to make HCA's entire system in-network at HCA's

---

[7] *See M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605 (1985) (conduct is exclusionary "[when] a firm has been 'attempting to exclude rivals on some basis other than efficiency'"); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015) (key is to "distinguish between conduct that defeats a competitor because of efficiency and consumer satisfaction" versus conduct that impedes competition by degrading product quality or reducing efficiency) (internal quotation marks omitted); *United States v. Microsoft Corp.*, 253 F.3d 34, 62, 65 (D.C. Cir. 2001) (condemning conduct that reduced rivals' sales "not by improving its own product" or by making its product "more attractive to consumers" but instead by imposing licensing terms preventing market participants from promoting rivals' products).

[8] *See Faulkner*, 905 F.2d at 772 (condemning tying under Section 1); *Microsoft*, 253 F.3d at 85 (tying exclusionary under Sections 1 & 2).

prices—something networks would not do in competitive markets. ¶¶78-89, 125-30.[9] Further, due to the Scheme's anti-steering and anti-tiering provisions, and the special economics of healthcare markets, plans are not permitted to steer patients toward, or incentivize patients to use, rival providers—even where such providers offered lower prices or better quality. ¶¶131-37.

HCA's further assertion that Plaintiffs fail to plead that the Scheme "precluded any insurer from forming networks that favor, or steer patients to, other providers over Mission," Mot. at 17, is mistaken. Forcing plans to treat HCA's higher priced offerings the same as rivals' lower priced options necessarily favors HCA. And HCA's assertion that Plaintiffs fail to allege that the Scheme "forced any Mission competitor from doing anything differently than before in terms of cost of or access to, their services, among other things," Mot. at 17, is also incorrect. Plaintiffs, in fact, allege that while competitors would ordinarily lower prices to compete for privileged positions in networks or tiers, the Scheme foreclosed that critical form of competition. ¶¶79-82; 142-49.[10]

---

[9] More specifically, Plaintiffs have alleged that HCA exploited its monopoly power over the GAC Services market in the Asheville region to force insurers ("payers," as per HCA, Mot. at 15) into taking HCA's tied products (GAC and Outpatient Services in the Outlying Region, Outpatient Services in the Asheville Region), all separate and distinct products. ¶¶120, 125-30.

[10] Plaintiffs allege that the Scheme impaired rivals' ability to compete by undermining the utility of attracting customers using lower prices or better quality. ¶¶142-44. Plaintiffs also allege that the Scheme harmed rivals' incentives to compete. *Id*. Conduct can be anticompetitive even if it does not exclude or impair a

The *Davis* court found that the *same course of conduct alleged here* constitutes an exclusionary restraint of trade. *Davis*, 2022 WL 4354142, at *8-15. The conduct was anticompetitive because the "contractual restrictions at issue" forced insurers into including in-network facilities "that they do not want," and that such coercion deprived insurers of "the power they would normally be able to exercise in a competitive market to decide which facilities should and should not be included" in-network. *Id.* at *13.

The *Davis* court relied upon earlier decisions in state and federal courts addressing what it called "similar claims arising in a virtually identical context against a hospital system called Sutter Health[.]" *Id.* at *11, referencing *Sidibe II*, 2021 WL 879875, and *UFCW I*, 2016 WL 3459451. In *Sidibe II*, like here, the plaintiffs alleged an "all or nothing" tying arrangements in which "Sutter used its market power for inpatient services in the Tying Market to force the health plans to include (in their networks) Sutter inpatient services in the Tied Markets." 2021 WL 879875, at *5. The *Sidibe II* plaintiffs further alleged, as here, that Sutter used anti-steering, anti-tiering, and secrecy restrictions. *Id.*[11] *Sidibe II* denied summary

---

rival's *ability* to compete where it reduces a rival's *incentives* to compete. *See Marchbanks Truck Serv., Inc. v. Comdata Network, Inc*., No. 07-CV-1078, 2012 WL 10218913, at *7 (E.D. Pa. Mar. 29, 2012); *Schuylkill Health Sys. v. Cardinal Health 200*, *LLC*, No. 12-7065, 2014 WL 3746817, at *4 (E.D. Pa. July 30, 2014).

[11] As in *Sidibe II*, HCA forces payers to accept gag clauses that prevent patients, other providers, other health plans, and existing or potential entrants, from knowing the monopoly prices that HCA charges. ¶¶138-41. These clauses are

judgment. *Id.* at *6-7. *See also UFCW I*, 2016 WL 3459451, at *3-4 (overruling demurrer where plaintiffs had alleged analogous "all-or-nothing, anti-incentive, and price secrecy terms foreclose price competition by rival providers").[12]

*Davis* also referenced (2022 WL 4354142, at *9-10) *Dicesare*, in which the court denied a motion for judgment on the pleadings against similar claims and held that some of the same types of provisions at issue here were plausibly alleged to have precluded competition and blocked consumers from shopping the marketplace for higher quality care at lower prices. 2017 WL 1359599, at *16-17 (the provisions "[p]rotect[ed] market power through means other than competition on the merits"). Finally, in *Atrium I*, which *Davis* also discusses at length (2022 WL 4354142, at *10-11), the court denied a motion for judgment on the pleadings

---

intended to, and do, prevent price competition by prohibiting payers from encouraging insureds to use more cost-effective providers. ¶¶17, 120, 138-41.

[12] HCA failed to inform the Court about either the summary judgment decision in *Sidibe II* or the demurrer decision on the same basic facts as *Sidibe II* in *UFCW I*. Nor did HCA disclose to the court the summary judgment decision in *UFCW II*, which upheld the claims in that case. *See* 2019 WL 3856011, at *2. HCA instead repeatedly relies on an earlier motion to dismiss opinion in *Sidibe v. Sutter Health*, 2013 WL 2422752 (N.D. Cal. June 3, 2013) ("*Sidibe I*"). *See* Mot. at 2, 16-18. But at the demurrer stage in *Sidibe*, the court dismissed the complaint without prejudice and with leave to replead on grounds not relevant here, namely because the initial complaint contained only bare bones allegations regarding substantial foreclosure and anticompetitive effect on more than an insubstantial volume of commerce. *Sidibe I* at *14. Plaintiffs here plead those elements with numerous specific allegations. ¶¶142-49 (substantial foreclosure); ¶¶150-88 (market-wide anticompetitive effects).

regarding the DOJ's challenge to anti-steering provisions under Sherman Act Section 1. 248 F. Supp. 3d at 723, 727-33.[13]

The same allegations of anticompetitive conduct that comprise Plaintiffs' Section 1 claim also satisfy the "willful maintenance" prong of Section 2, which distinguishes exclusionary conduct "from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); s*ee also Dicesare*, 2017 WL 1359599, at *17 (observing that the same kinds of practices can constitute violations of both Sections 1 and 2).[14] Because Plaintiffs allege the Scheme uses monopoly power in the GAC market in Asheville "to foreclose competition, to

---

[13] The court in *Atrium I* observed that the DOJ's allegations "state that steering typically lowers health care expenses, threatens [the defendant hospital's] high prices and revenues, induces price competition, . . . and incentivizes providers to be efficient and innovative." *Id.* at 731. Those allegations mirror Plaintiffs' allegations here. *See* ¶¶78-89, 131-137, 144, 150-188.

[14] *See also Dickson v. Microsoft Corp.*, 309 F.3d 193, 201 (4th Cir. 2002) (observing that while Section 2 has a more stringent test for monopoly power than Section 1, "[t]he same kind of practices . . . may evidence violations of both"); *Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 463 (1960) ("[S]ections [1 & 2] closely overlap, and the same kind of predatory practices may show violations of [both]."); *Schneiderman*, 787 F.3d at 652 (citing *Microsoft*, 253 F.3d at 58-60) (same).

gain a competitive advantage, or to destroy a competitor,"[15] it therefore also qualifies as exclusionary conduct under Section 2.[16]

HCA's assertion that Plaintiffs have not alleged anticompetitive conduct with sufficient particularity, Mot. at 14-17, is erroneous in three main respects. First, Plaintiffs in fact allege that the contracts between HCA and payers include anti-tiering and anti-steering provisions, as well as gag clauses. ¶¶131-41. Plaintiffs also allege that payers are subject to HCA's all-or-nothing tying arrangements, and that they must either accept all HCA facilities in their networks or take none of them. ¶¶125-30. Plaintiffs allege an example: namely, when Blue Cross refused to accept all Mission facilities as part of its network in Western North Carolina, Mission retaliated by removing itself entirely from the Blue Cross network, leaving thousands of Blue Cross customers to scramble to find new providers. ¶¶129-30. Shortly after that, Blue Cross capitulated, accepting a rate increase and inclusion of the entirety of the Mission system in all Relevant Markets in network. *Id.*[17]

---

[15] *Kolon Indus.*, 637 F.3d at 441 (quoting *Eastman Kodak v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992)).

[16] The *Davis* court dismissed without prejudice the plaintiffs' monopolization claim primarily because the state plaintiffs had pled that their market share allegations were based on Medicare data. *Davis*, 2022 WL 4354142, at *18-19. Plaintiffs' Complaint here does not suffer from that defect as it pleads market shares in the private payor market, ¶¶111-18, and makes no reference to Medicare. Further, and at the appropriate time, Plaintiffs will be able to demonstrate that the Medicare and private payor market shares are similar in the Relevant Markets.

[17] HCA disputes the relevance of the Blue Cross example in two ways, Mot. at 15 n.7, neither meritorious. First, HCA asserts that the example is not indicative of

Second, HCA does not deny the existence of the contractual provisions, nor does it attach any contracts to its Motion to show that the provisions do not exist. Indeed, Defendants effectively concede the plausibility of Plaintiffs' allegations by admitting that the provisions and practices at issue "*are not uncommon in commercial healthcare contracts*." Mot. at 19 (emphasis added). Moreover, bolstering plausibility, the Complaint alleges that "HCA has a pattern and practice" of engaging in the same conduct in other states and regions. ¶¶124, 137.

Further, HCA's argument that Plaintiffs fail to allege "what specific Mission services were tied, how insurers and/or patients and physicians were prohibited (if at all) from seeking services from other providers, and what pricing information insurers could not disclose," Mot. at 16-17, is without merit. HCA cites no authority requiring all those details to state a Sherman Act claim.[18] But HCA is

_____

"all or nothing" contracting. *Id*. But these allegations show that when the largest insurer in the region attempted to push back against Mission's price increases, Mission resorted to the "nuclear option," ¶130, and took its entire system out of network until Blue Cross agreed to "the inclusion of the entirety of the Mission system." *Id*. Second, HCA's argument that this incident is irrelevant because it supposedly pre-dates the statute of limitations is also wrong for two reasons: (1) the Court may draw an inference that because Mission engaged in this conduct as recently as five years ago it is probative of its current conduct and its effects, and (2) it is well-settled law that where conduct that began before the limitations period is continuing to harm plaintiffs during the limitations period, it can be considered because the cause of action accrues each time the continuing scheme causes injury to the plaintiffs. *See* ANC Opp. Br. at 9-13 (citing authorities).

[18] HCA urges that the complaint that survived the motion for judgment on the pleadings in *Atrium* was more detailed than the Complaint here because it (a) identifies the insurers by name, and it (b) alleged that the restrictive provisions

also mistaken on the facts. As set forth above, Plaintiffs specifically allege, *inter alia*, the precise forms of conduct at issue; the markets in which the conduct takes place; and the detrimental effects on competition in those markets.[19]

---

"actually inflicted an identifiable harm on consumers." Mot. at 18. But, first, there is no requirement—and HCA cites none—that Plaintiffs must identify all of the counterparties by name. Moreover, the Complaint does in fact: (i) identify Blue Cross, the largest insurer in North Carolina, as having been subject to the restrictive practices, ¶¶129-30; (ii) alleges the practices and their market effects in detail, ¶¶119-141 (practices) & ¶¶142-188 (effects); (iii) analogizes the conduct here to that in *Atrium I*, ¶¶123, 134; (iv) alleges that HCA uses the same tactics and provisions in contracts with health plans in Colorado and Virginia, ¶124; and (v) alleges that the Scheme has inflicted "an identifiable harm on consumers" in multiple ways, including, *inter alia*, by restricting "the introduction of innovative insurance products that are designed to achieve lower prices and improved quality[.]" ¶¶142-188. *Davis* found similar allegations of exclusionary conduct to that Plaintiffs allege here sufficient. 2022 WL 4354142, at *20-21.

[19] HCA's reliance on *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 646 F. Supp. 2d 489 (S.D.N.Y. 2009), Mot. at 16, is misplaced. There, the plaintiffs "lumped together" a number of "Agent Banks" that allegedly joined together to engage in a tying arrangement "without identifying specific tying arrangements, an underwriting agreement or an email" and thus did not plead sufficiently. 646 F. Supp. 2d. at 492-495. Here, Plaintiffs explicitly identify the Defendants (Mission, then HCA), a specific tying arrangement in all of its network contracts covering all of the health plans in the region ("all-or-nothing" demands), the services that were tied (Asheville GAC Services to GAC Services in the Outlying Regions and Outpatient Services in the Asheville and Outlying Regions), and other components of anticompetitive conduct that comprise the Scheme. *E.g.*, ¶¶28-56 (describing the Defendants); ¶¶125-130 (describing the tying arrangements, including the tied and tying services); ¶¶131-141 (describing the anti-steering, anti-tiering, and gag components of the scheme). *Wholesale Alliance, LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069, 1079-80 (E.D. Mo. 2019), Mot. at 16, is likewise inapposite because the plaintiff there admitted the products at issue were not tied, unlike here where a specific tie is alleged. Nor is *BanxCorp v. Bankrate, Inc.*, No. 07-3398, 2008 WL 5661874 (D.N.J. July 7, 2008), Mot. at 16, on point because there the plaintiff merely utilized "general allegations or hypothetical examples" of bundling "mechanics," and only alleged "one alleged instance" of tying and no "evidence

16

**B.      Plaintiffs Plead HCA's Scheme Maintained Monopoly Power**

Plaintiffs repeatedly allege HCA's dominant market position in the Relevant Markets. *See*, *e.g.*, ¶¶10-11, 112 (80-90 percent market share in the GAC market the Asheville region); ¶114 (market shares between 74.7 and 88.3 percent in the GAC market in the Outlying Region). Plaintiffs also allege "other grounds" that demonstrate that the Scheme harms competition, such as the inherently anticompetitive nature of the contractual provisions, as well as HCA's dominant position in the Relevant Markets, which leaves plans no choice but to include all of HCA's providers in their networks. *See*, *e.g.*, ¶¶10-11. HCA does not dispute that Plaintiffs allege HCA's possession of monopoly power in all inpatient Relevant Markets. Nor does HCA challenge any of the Relevant Markets. But HCA claims that Plaintiffs do not allege that HCA's conduct has maintained monopoly power.

HCA's argument ignores the Complaint. Plaintiffs allege in detail HCA's Scheme to "gain, maintain, and bolster" that monopoly power. ¶119. Plaintiffs specify HCA's use of anticompetitive contractual provisions, from "all or nothing requirements" (¶¶125-130) to anti-steering and anti-tiering provisions (¶¶131-137) to gag clauses and anti-transparency provisions (¶¶138-141). Plaintiffs explain how

---

[of] a general tying scheme." 2008 WL 5661874, at *8. Here, Plaintiffs allege that all of the network agreements covering all of the plans require that to access the tying product (GAC Services in the Asheville Region), payers must accept all other HCA providers and facilities in Asheville and the Outlying Regions. ¶¶125-130.

those impair health plans from assembling networks of highest-quality and lowest-cost providers (¶143); impair the ability of rival providers to compete using price and quality (¶144); and prevent the dissemination of price information that would facilitate competition (¶¶143-45).[20] HCA disregards the above allegations and simply asserts, without support, that it cannot have maintained monopoly power if HCA had obtained that power through the COPA. Mot. at 11. But the premise of the Complaint is that HCA abused the monopoly power it acquired while the COPA was in place to *maintain* and *enhance* monopoly power in some of the markets, and to *acquire* or *enhance* this power in others, *after* the COPA had expired. ¶¶8-9, 11-23, 112, 115, 146-48.

HCA next asserts that Plaintiffs have not tied the anticompetitive effects that the Complaint alleges to the anticompetitive contractual provisions at issue. Mot. at 13. Again, ignoring a raft of other allegations of the effects of HCA's conduct, HCA focuses on Plaintiffs' allegations that C-Sections without complications cost more than double the statewide average (¶157) and that 79 doctors had left the system since HCA's takeover (¶172). It is not Plaintiffs' burden to prove causation on a motion to dismiss; courts routinely deny motions to dismiss asserting that

---

[20] The economic literature uniformly recognizes the anticompetitive nature of such practices, which formed the basis for a successful enforcement action by the U.S. DOJ. *See Atrium I*, 248 F. Supp. 3d at 731; *see also*, *e.g.*, Matthew B. Frank et al., *The Impact of a Tiered Network on Hospital Choice*, 50 Health Servs. Rsch. 1628 (2015) (explaining benefits of tiering).

causation has not been adequately alleged. *See*, *e.g.*, *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743 (N.D. Cal. 2022). And the Complaint explains at length the link between the conduct and the effects: as a result of the contractual provisions at issue, consumers pay more and are denied access to higher-quality and lower-cost care. *See*, *e.g.*, ¶168. After setting out numerous examples of supracompetitive prices, Plaintiffs make the link explicit:

> In a competitive market, insurers contracting with a hospital can discipline such pricing behavior by threatening in their negotiations, *inter alia*, to take the hospital out of network and to purchase services from a competitor and/or to steer patients to less expensive or higher quality alternatives. *But because of Defendants' monopoly power and Scheme to maintain and enhance it, insurance plans are forced to pay artificially inflated prices and endure substandard care.*

¶187 (emphasis added). Another court upheld a similar complaint alleging that imposing the requirement that plans include all of a system's services at a demanded price "eliminate[s] competition on the basis of price." *UFCW II*, 2019 WL 3856011, at *2-3.[21]

HCA also asserts that Plaintiffs failed to allege that HCA unlawfully obtained or maintained monopoly power for Outpatient Services, contending that most of Plaintiffs' allegations concern GAC Services. *See* Mot. at 14. HCA again

---

[21] *See Atrium I*, 248 F. Supp. 3d at 731 (listing negative effects of contractual provisions and holding that "Plaintiffs tie these effects directly to [defendant's] market power by alleging that insurers would prefer not to have steering restrictions in their contracts but are unable to remove them…").

ignores specific allegations evidencing monopoly power in Outpatient Services: cuts in quality and supracompetitive prices.[22] As to lower quality and reduced output, Plaintiffs allege that "since HCA's acquisition of the Mission system, HCA has cut Outpatient Services in the Outlying Region, compelling patients to travel to HCA's Asheville facilities to obtain care." ¶117; ¶149. Plaintiffs also specifically allege higher prices for Outpatient Services tied to the Scheme. *See* ¶¶154, 165.[23]

### C. Plaintiffs Adequately Plead Anticompetitive Effects

HCA acknowledges that Plaintiffs allege direct effects of the alleged conduct "through decreased service quality, reduced output, and increased costs of certain services." Mot. at 22; *see Atrium I*, 248 F. Supp. 3d at 728 (listing increased prices, reduced output, and decreased quality as direct effects to show restraint of trade). HCA attempts to dismiss these allegations as "anecdotes," Mot. at 22, asserting that the Complaint lacks allegations of anticompetitive effects. Mot. at

---

[22] HCA acknowledges that market share data is not available for Outpatient Services (Mot. at 14), but as courts have recognized, showing that a defendant's conduct exerted an adverse effect on competition "arguably is more direct evidence of market power than calculations of elusive market share figures." *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001); *see also*, *e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (supracompetitive prices are "direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power").

[23] HCA's citation (Mot. at 14) to *Gordon v. Lewistown Hospital*, 272 F. Supp. 2d 393, 434 (M.D. Pa. 2003), a decision on summary judgment, is thus inapposite. Plaintiffs are not attempting to use inpatient services as a "proxy" for something else, as the plaintiffs in *Gordon* were, but instead have alleged the direct effects of the Scheme on outpatient care.

21-25. But the Complaint contains detailed allegations of those effects, and it ties those effects directly to the Scheme. *E.g.*, ¶¶151-166 (inflated prices); ¶¶167-88 (reduced output and reduced quality of care).[24]

### D. HCA's Assertion that its Conduct is Procompetitive is Erroneous

Despite claiming Plaintiffs do not sufficiently allege that HCA engages in the alleged practices, Mot. at 14-18, HCA also claims that the Scheme "provide[s] procompetitive benefits." Mot. at 19. This is both premature and wrong. Resolution of procompetitive justifications is inappropriate at the pleading stage. As the District emphasized in *Atrium I*, determining whether a restraint on trade is unreasonable "is a fact-intensive inquiry." 248 F. Supp. 3d at 729. This is particularly true in the healthcare context, where the Court "should consider, among other things, the facts peculiar to the health care industry, the effect of the activities on health providers, and the impact of the activities on costs to the ultimate consumer. The history of the restraint and the purpose or end sought are also relevant facts. . . . Resolution of these fact-intensive inquiries requires

---

[24] Plaintiffs may also allege "anticompetitive effects indirectly by showing that the defendant has sufficient market power to cause an adverse effect on competition. . . . plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *United States v. Am. Express Co.*, 838 F.3d 179, 194-95 (2d Cir. 2016) (internal quotation marks omitted). Plaintiffs have pled that HCA's conduct harmed competition.

discovery, and perhaps ultimate decision by a fact-finder." *Id.* at 729-30 (internal citation omitted).[25]

The Fourth Circuit also has underscored the fact-intensive nature of the relevant inquiry: "The required analysis varies by case and may extend to a plenary market examination, covering the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed, as well as the availability of reasonable, less restrictive alternatives." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002) (internal quotations marks omitted).

In any event, it is not the case that the contractual terms at issue here "are known to have procompetitive benefits." Mot. at 21. In fact, in cases involving substantially similar conduct, courts have upheld complaints alleging provisions like all-or-nothing negotiating tactics "eliminate competition on the basis of price." *UFCW II*, 2019 WL 3856011, at *2-3. And the *Sidibe II* court credited evidence that all-or-nothing tactics "result[ed] in higher prices." 2021 WL 879875, at *2. Similarly, in *Atrium I*, the court recognized the "potential for genuine adverse effects on competition" from provisions very similar to those alleged in this case. 248 F. Supp. 3d at 731 (quoting *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460

---

[25] HCA complains that Plaintiffs rely on Medicare data to show supracompetitive prices, Mot. at 23-24, but cites to no such allegation. Even if challenges to Plaintiffs' data source were appropriate on a motion to dismiss, HCA's argument misapprehends the Complaint: contrary to HCA's assertion, Plaintiffs' allegations about HCA's inflated pricing are not based on Medicare data. *See* ¶¶155-66.

(1986)). For example, the court noted, "steering typically lowers health care expenses, threatens [the defendant's] high prices and revenues, induces price competition, impedes insurers from incentivizing less-expensive or high quality alternative providers, and incentivizes providers to be efficient and innovative." *Id.* And in *Dicesare*, the court recognized that the contractual provisions as alleged "have an actual adverse effect on competition as a whole in the relevant market." 2017 WL 1359599, at *17.[26]

HCA's attempt to claim that gag clauses have procompetitive benefits is wrong, too. It is well-settled that "the dissemination of information is normally an aid to commerce." *Sugar Inst. v. United States*, 297 U.S. 553, 598 (1936). "Disseminating information that fosters rational business decisions is pro-competitive." *Int'l Healthcare Mgmt. v. Hawaii Coal. For Health*, 332 F.3d 600, 608 (9th Cir. 2003). Further, giving patients complete information in health care markets is essential, given that while their provider choices drive demand, they do not participate in the negotiations between providers and insurers. Ignoring these well-settled principles and foundational tenets of healthcare economics, HCA

---

[26] Accordingly, *King Drug Co. of Florence Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 413 n.38 (3d Cir. 2015), which HCA cites for the proposition that a defendant may "prevail[] on a motion to dismiss . . . if, for example, there is no dispute that, under the rule of reason, the procompetitive benefits . . . outweigh . . . alleged anticompetitive harm," Mot. at 22, is inapposite. The effects of these provisions are disputed.

instead quotes a portion of *Water Transp. Ass'n v. Interstate Com. Comm'n*, 722 F.2d 1025, 1032 (2d Cir. 1983), Mot. at 19-20, which discussed price disclosures among competitors, not to consumers.[27]

### E. Plaintiffs Sufficiently Plead Substantial Foreclosure

Ignoring Plaintiffs' allegations of substantial foreclosure, ¶¶142-149, HCA argues that Plaintiffs must allege that the unlawful conduct "foreclose[d] at least 30 percent to 40 percent of the market to support a § 1 violation."[28] But the line of authority invoked by HCA addresses exclusive dealing contracts, *e.g.*, *Methodist Health Servs.*, 2016 WL 5817176, at *8, which provide for a special case of the traditional rule of reason analysis applicable only to exclusive dealing. Here, plaintiffs do not allege exclusive dealing contracts; they allege an anticompetitive

---

[27] HCA's attempts to claim procompetitive benefits, Mot. at 19-20, also rely on distinguishable authority. For example, the quoted portion of *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895 (9th Cir. 2007), does not concern, as HCA states, "all-or-nothing" provisions at all, but instead discusses, in a review of post-trial motions, the potential effects of "bundled discounts," *id.* at 896, which are not alleged here. *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992), too, did not involve "all-or-nothing" contracts, as HCA contends, but what the court called "tie-ins in concentrated markets" that the court assessed on summary judgment. And while HCA asserts that *Barry v. Blue Cross of Cal.*, 805 F.2d 866, 872 (9th Cir. 1986), is about the "benefits of anti-steering provisions," that case did not involve prohibitions on steering, but instead a notice provision that required doctors to notify patients if a referral was made to a nonparticipating physician.

[28] Mot. at 24-25 (quoting *Am. Express Travel Related Servs. Co. v. Visa U.S.A.*, No. 04-cv-8967, 2005 WL 1515399, at *3 (S.D.N.Y. Jun. 23, 2005), and *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 1:13-cv-1054, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016)).

Scheme that adversely affected competition in other ways, *see*, *e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. —, 138 S. Ct. 2274, 2284 (2018), and thus showing substantial foreclosure is unnecessary.

Even if the Court requires pleading 30-40% foreclosure, Plaintiffs more than satisfy that test. The Complaint explains that HCA has imposed anticompetitive contract terms on plans operating throughout the Relevant Markets. *See* ¶¶88, 131. HCA readily concedes that the terms are "not uncommon in commercial healthcare contracts." Mot. at 19. These terms foreclose competition *market-wide*. ¶¶142-89. Where rival providers cannot shift volume through lower prices, they are effectively foreclosed from competing with HCA. *See* ¶147. Because other providers cannot compete, HCA therefore has no incentive to offer competitive prices or quality; it can set prices and reduce quality with impunity. As a result, HCA's high market shares (*see* ¶¶10-11, 112-16) are effectively baked-in, despite cuts in quality and output. More than foreclosing some relatively modest percentage of the Relevant Markets, HCA has worked a shutdown of competition which has allowed it to freeze its dominant position in place.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: October 14, 2022

/s/ Robert N. Hunter, Jr.
Robert N. Hunter, Jr.
Fred Berry
John F. Bloss
HIGGINS BENJAMIN, PLLC
301 North Elm Street, Suite 800
Greensboro, NC 27401
Phone: (336) 273-1600
Facsimile: (336) 274-4650
rnhunter@greensborolaw.com
fberry@greesnborolaw.com
jbloss@greensborolaw.com

Eric L. Cramer*
Jacob M. Polakoff*
Robert Berry**
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
jpolakoff@bm.net

Robert E. Litan*
Daniel J. Walker*
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net
dwalker@bm.net

Brendan P. Glackin**
Dean M. Harvey**
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, Suite 2900
San Francisco, CA 94111
Phone: (415) 956-1000
bglackin@lchb.com
dharvey@lchb.com

Daniel E. Seltz**
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Phone: (212) 355-9500
dseltz@lchb.com

*Counsel for Plaintiffs and the Proposed Class*

*Admitted *pro hac vice*
**Application for admission *pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 14, 2022, a true and correct copy of the foregoing was filed with the Court via the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

Dated: October 14, 2022 <u>/s/ Robert N. Hunter, Jr.</u>
Robert N. Hunter, Jr.