# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **IN RE MISSION HEALTH ANTITRUST LITIGATION** | **No.: 1:22-cv-00114-MR-WCM**<br><br>**HCA DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

ARGUMENT .............................................................................................................3

I. THE OPPOSITION IGNORES THE MONOPOLIZATION CLAIM'S FATAL FLAWS ............................................................................3

    A. The GAC Monopoly Claim Is Neither Well-Pled Nor Plausible. ........3

    B. The Claim That Mission Obtained, Maintained Or Enhanced Outpatient Monopoly Power Finds No Support In The Complaint. ...............................................................................................5

II. PLAINTIFFS LACK ALLEGATIONS REGARDING UNLAWFUL CONDUCT. ......................................................................................................6

III. THE COMPLAINT'S ADVERSE MARKET EFFECT ALLEGATIONS ARE DEFICIENT. ...........................................................10

    A. The Complaint Lacks Direct Evidence Of Adverse Market Effects .....................................................................................................10

    B. The Complaint's Market Share Data Is Insufficient. .........................10

CONCLUSION .........................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adelphia Recovery Trust v. Bank of America, N.A.*,
   646 F. Supp. 2d 489 (S.D.N.Y. 2009) ................................................................7

*BanxCorp. v. Bankrate, Inc.*,
   2008 WL 5661874 (D.N.J. July 7, 2008) ............................................................7

*Davis v. HCA Healthcare, Inc.*,
   2022 WL 4354142 (N.C. Super. Sept. 19, 2022) ........................................ passim

*Faulkner Advertising Associates Inc. v. Nissan Motor Corp.*,
   905 F.2d 769 (4th Cir. 1990) ...............................................................................8

*Pac. Bell Telephone Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) .............................................................................................6

*Sidibe v. Sutter Health*,
   2013 WL 2422752 (N.D. Cal. June 3, 2013) .......................................................5

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
   8 F.4th 479 (6th Cir. 2021) ..................................................................................4

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
   248 F. Supp. 3d 720 (W.D.N.C. 2017) ................................................................9

**Other Authorities**

American Hospital Directory, "Profile Definitions and Methodology,"
   available at https://www.ahd.com/definitions/free_iporig.html ...........................3

The HCA Defendants[1] respectfully submit this reply memorandum of law in support of their motion to dismiss the Complaint (the "Motion") (ECF No. 45).

## INTRODUCTION

As Plaintiffs admit, this action is similar to *Davis v. HCA Healthcare, Inc.*, where the North Carolina Business Court recently dismissed plaintiffs' monopolization claims but sustained the restraint of trade claims based on the state's more "lenient" pleading standard. 2022 WL 4354142, ¶ 39 (N.C. Super. Sept. 19, 2022). *Davis*'s reasoning is sound, and provides a basis to dismiss Plaintiffs' monopolization ***and*** restraint of trade claims under the "more exacting" pleading standard here. *Id.* Plaintiffs argue that their claims are the same as those against other hospitals that courts have sustained, but unlike those other hospitals, Mission lawfully obtained its alleged market power under North Carolina's COPA. All of Plaintiffs' claims should be dismissed.

***First***, as to the monopolization claim, Plaintiffs fail to plausibly allege that Mission unlawfully obtained or maintained a monopoly over any service in any market. Whatever market share Mission currently has is explained by the COPA, which ended just five years ago; Plaintiffs do not argue—and the Complaint does not allege—facts suggesting that Mission was incentivized to engage in unlawful

---

[1] Capitalized terms have the same meaning as in the Motion. All internal citations and quotations are omitted, and emphasis is added, in case citations.

practices post-COPA. And the *Davis* court held that the allegations in that case (which are the same here) were not sufficient to sustain claims that Mission's alleged contractual provisions affected Asheville. Additionally, Plaintiffs' allegations of Mission's market shares do not support their claims: (1) for inpatient services, Plaintiffs rely on Mission's current market share for GAC services covered by Medicare payors, which (as *Davis* held) are irrelevant to these claims and (2) for outpatient services, Plaintiffs present no market share data whatsoever.

*Second*, with regard to both monopolization and the restraint of trade claims, the Complaint does not allege that Mission's contracts contain anticompetitive clauses that harm competitors or insurers in North Carolina. Plaintiffs argue that they do not have access to the contracts and that their generic allegations about why such provisions are harmful to competition abstractly are sufficient. But Plaintiffs are mistaken that any federal court, applying the more exacting federal pleading standard, has sustained antitrust claims based on such threadbare allegations.

*Finally*, Plaintiffs' argument that the Complaint sufficiently alleges adverse effects falls flat. Unable to offer allegations that any (i) competitor lost market share, (ii) would-be competitor was prevented from entering any alleged market, or (iii) insurer was prevented from competing in a meaningful way, Plaintiffs emphasize anecdotes about how Mission's prices have gone up and its quality and output have decreased. Even if accepted, such allegations do not address how *competition* has

2

been substantially and adversely effected. For these reasons, dismissal is required.

## ARGUMENT

## I. The Opposition Ignores The Monopolization Claim's Fatal Flaws

### A. The GAC Monopoly Claim Is Neither Well-Pled Nor Plausible.

Plaintiffs' contention that the *current* GAC market share data pled in the Complaint is sufficient to demonstrate Mission's unlawful monopolization is wrong for two reasons. First, that data is irrelevant because it is based on market share for services covered by Medicare, which the Complaint pleads is irrelevant. Compl. ¶ 91; *Davis*, 2022 WL 4354142, ¶¶ 87-92 (rejecting identical data) (citing cases).[2]

Second, even if that data were relevant, it is consistent with Mission having lawfully acquired its current market share position during the COPA. Plaintiffs contend that the COPA is irrelevant because their claims are about Mission "maintaining and enhancing" its monopoly post-COPA. Opp. 18. But that argument misses the point, which is that current GAC market share data in and around Asheville is not suggestive of *unlawful* monopolization when Plaintiffs have admitted that whatever market share Mission has was *lawfully* acquired. Compl. ¶ 72. There are no allegations that, post-COPA, Mission's GAC market share has

---

[2] Plaintiffs say that the data is based on "market shares in the private payor market," Opp. 14 n.16, but the Complaint seems to source it from the American Hospital Directory, Compl. ¶ 112 n.16, which states that the data is based on "all Medicare fee-for-service claims". *See* American Hospital Directory, "Profile Definitions and Methodology," available at https://www.ahd.com/definitions/free_iporig.html.

3

changed, that Mission uses the alleged contract provisions in an effort to maintain its market position in Asheville, *see Davis,* 2022 WL 4354142, ¶ 80, that Mission has any incentive to engage in anticompetitive conduct (*e.g.*, because of competitive pressure), or that competition has been disadvantaged by Mission's conduct.

Plaintiffs argue that the "inherently anticompetitive nature of the contractual provisions" demonstrates monopoly power. Opp. 17. However, they cite no case supporting this theory, which has been implicitly rejected in cases like *Davis* that have dismissed monopolization claims notwithstanding allegations that defendants forced onto counterparties tying, anti-steering/tiering provisions, and by seriatim cases acknowledging that these types of provisions have procompetitive virtues. *See Davis*, 2022 WL 4354142, ¶¶ 78, 82, 99, 102; Mot. 19-20 (citing cases).

Plaintiffs also argue that Mission's allegedly higher prices and reduced output are suggestive of unlawful monopolistic conduct, but that is wrong. First, companies are free to do those things lawfully. Mot. 23. Second, both things would be perfectly consistent with, and explained by, Mission having lawfully obtained substantial market share with respect to GAC services. *Id.* 12-13 (citing cases). Finally, given that Mission had a lawful monopoly over GAC services for two decades, the claim that Mission would resort to unlawful behavior to acquire, maintain or enhance its GAC market share post-COPA is neither plausible nor well-pled, especially given the lack of allegations that it's alleged monopoly power was in jeopardy.

4

### B. The Claim That Mission Obtained, Maintained Or Enhanced Outpatient Monopoly Power Finds No Support In The Complaint.

Plaintiffs admit that they have no outpatient market share data to support their outpatient monopolization claim. Opp. 20 n.22. Plaintiffs also admit that they are not relying upon inpatient market share as a proxy for outpatient market share. *Id*. That should be the end of Plaintiffs' outpatient monopolization claim because there are, thus, no facts alleged to support the contention that Mission has monopoly power with respect to outpatient services in any geographic market.

Nonetheless, Plaintiffs contend that Mission's monopoly power can be inferred from "cuts in quality and supracompetitive prices" as alleged in four paragraphs in their Complaint. Opp. 20 (citing Compl. ¶¶ 117, 149, 154, and 165). Two of those paragraphs (117 and 149), however, simply state that Mission's allegedly anticompetitive conduct has resulted in reduced output and higher prices without elaboration, which is conclusory. *See Sidibe v. Sutter Health*, 2013 WL 2422752, at *14 (N.D. Cal. June 3, 2013) (dismissing as conclusory similar allegations of "dramatically increased" hospital prices). The third paragraph (154) alleges that Mission, at its Asheville hospital location, charges insurers 341% above the Medicare price for outpatient services while other North Carolina providers charge 331% more on average—an 8 percentage point difference. But allegedly charging higher prices than the statewide average is not unlawful and is not indicia of monopoly power. *See Pac. Bell Telephone Co. v. linkLine Commc'ns, Inc.*, 555

5

U.S. 438, 454 (2009). The last paragraph (165), simply alleges that at one of the many Mission facilities that provides outpatient services (McDowell), Mission prices are 50% higher than the state average. Again, alleged higher prices are perfectly lawful, and are hardly suggestive of the sweeping conclusion that Mission has outpatient monopoly power in two multi-county markets. Indeed, *Davis* rejected nearly identical allegations as "conclusory" and insufficient to plead monopolization even under North Carolina's more "lenient" standard. 2022 WL 4354142, ¶¶ 94, 97.

## II. Plaintiffs Lack Allegations Regarding Unlawful Conduct.

Plaintiffs do not dispute that their monopolization and restraint of trade claims require plausible factual allegations that Mission's contracts with insurers contain anticompetitive provisions and that such provisions substantially harm competition in western North Carolina. *See* Compl. ¶ 120. Glaringly, the Complaint lacks such allegations. Plaintiffs offer a host of arguments in response, none of which has merit.

First, and most tellingly, Plaintiffs say they do not have access to the contracts pursuant to which they pay Mission for its services. Opp. 6. Even if that unpled assertion were credited and not inconsistent with the Complaint's allegations, *see* Compl. ¶¶ 79-80 (describing how health plans negotiate directly with providers), it does not help Plaintiffs. Rather, it proves that they have no factual basis to contend that Mission's contractual arrangements are anticompetitive, and that their case is built on speculation that Mission's contracts must contain anticompetitive provisions

6

because prices are supposedly going up and quality is supposedly decreasing.³

Second, Plaintiffs contend that the Complaint "alleges that the contracts between HCA and payers include" the complained-of provisions, Opp. 14 (citing Compl. ¶¶ 131-41), but the paragraphs they cite do not support that assertion. Most paragraphs allege generally that tying, anti-steering and "gag" clauses are anticompetitive, and the few specific to Mission offer only conclusory assertions that Defendants "abused [their] monopoly power . . . to impose" the supposed provisions. Compl. ¶ 131. No facts are alleged as to what contracts are implicated, how the provisions were negotiated or "forced" onto insurers, or even how the offending provisions actually work to restrict insurers and harm competition in North Carolina. And no facts are alleged plausibly explaining *why* Mission would even engage in such conduct given that, according to Plaintiffs, it already had significant market share due to the COPA. This is dispositive. *See* Mot. 16-18 & n.8 (citing cases).⁴

Recognizing this shortcoming, Plaintiffs argue that they have alleged "an

---

³ Plaintiffs also argue that HCA's contracts must have anticompetitive provisions because Defendants, in moving to dismiss, did not "deny" this and did not attach the contracts. *Id.* Such a denial would be improper for Defendants to make at this stage, and Plaintiffs' argument ignores that it is Plaintiffs' burden to plead facts plausibly suggesting harm to competition in the alleged relevant markets.

⁴ Plaintiffs try to distinguish Defendants' cases on superficial grounds, for example that in *BanxCorp. v. Bankrate, Inc.*, 2008 WL 5661874 (D.N.J. July 7, 2008) plaintiffs offered only "general allegations . . . of bundling mechanics, and only alleged one [ ] instance of tying", or that in *Adelphia Recovery Trust v. Bank of America, N.A.*, 646 F. Supp. 2d 489 (S.D.N.Y. 2009) plaintiffs did not identify "the specific tying arrangements", Opp. at 16 n.19, but those problems also apply here.

7

example," namely a 2017 dispute between BCBS and Mission whereby Mission allegedly went out of BCBS' network before the parties resolved their dispute. Opp. 14. But this exact example was cited by the court in *Davis* as evidence that Mission lacks market power, because it showed that Mission did not "*control* prices" and was, at best, "a contract dispute[]" that did not "adequately illustrate[] Defendants' monopoly power." 2022 WL 4354142, ¶¶ 94, 97 (emphasis in original).

Last, Plaintiffs pivot to arguing that Defendants ask too much in requesting that the Complaint plead some ***facts*** describing what Mission conduct is really at issue and how such conduct has affected competition in the areas Mission operates. Plaintiffs go so far as to argue that it is sufficient for them to allege generically that the offending provisions exist and "undermine[ ] competition" by forcing competitors or insurers from doing "something that [they] would not do in a competitive market," like including facilities in-network. Opp. 9. But no cited case supports such a low bar to pleading antitrust claims.[5] Given the well-recognized ***procompetitive benefits*** of the provisions at issue here, more is required than alleging that those provisions exist to adequately plead ***anticompetitive*** conduct.[6]

---

[5] *Davis* rejected the claim that forcing insurers like BCBS into accepting facilities in-network necessarily would give rise to antitrust liability, and in *Faulkner Advertising Associates Inc. v. Nissan Motor Corp.*, 905 F.2d 769 (4th Cir. 1990), "the sole issue in dispute" was whether plaintiff "properly alleged" that defendant adequately alleged a link between the allegedly tied products," *id.* at 773, which is irrelevant here.

[6] While not disputing that the rule of reason applies, Plaintiffs contend that there are

8

Plaintiffs' cases involving Sutter Health and Charlotte-Mecklenburg (*Atrium*) are not to the contrary. As an initial matter, Plaintiffs cite several summary judgment and class settlement decisions from those cases, which are irrelevant to assessing the adequacy of the pleadings. Further, as to the decisions on the pleadings, Plaintiffs ignore that the operative *Sutter* and *Atrium* complaints that survived motions to dismiss pleaded substantially more facts than here, including (i) the language of the specific provisions in those hospitals' contracts with insurers that was supposedly anticompetitive; and (ii) how those provisions prohibited specific insurers ***in the relevant markets*** from creating alternative, low-cost networks. More on-point are the earlier *Sutter* decisions dismissing theories similar to those here for lacking sufficient factual content about how the claimed tying and anti-steering provisions actually stifled competition in the markets those hospitals served. Mot. 17; *Davis* 2022 WL 4354142, ¶ 63.[7] \*\*\*

---

no benefits to these types of provisions. Opp. 22. But even *Sutter* and *Atrium*, Plaintiffs' preferred cases, recognize that such provisions can be beneficial to competition. *See, e.g., United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 732 (W.D.N.C. 2017). Plaintiffs also argue that it is premature to consider the provisions' benefits, Opp. 21, but that misses the point—given that the provisions are not *per se* unreasonable, Plaintiffs must allege more than just that the provisions have resulted in higher prices.

[7] To be sure, *Davis* allowed plaintiffs' restraint of trade claims to proceed based on allegations similar to those here, although it did so based on "North Carolina's lenient Rule 12(b)(6) standard rather than the more exacting federal plausibility standard," and only after the court found persuasive the *Sutter* summary judgment decision. 2022 WL 4354142, ¶¶ 39, 56-59. Under that "more exacting" federal pleading standard, it is clear that what Plaintiffs have alleged here is not sufficient.

9

**III. The Complaint's Adverse Market Effect Allegations Are Deficient.**

**A. The Complaint Lacks Direct Evidence Of Adverse Market Effects**

In a cursory three sentences, Plaintiffs contend that the Complaint's assertion of increased prices and reduced quality are supported by "detailed allegations" that provide direct evidence of adverse market effects from the alleged contractual provisions. Opp. 21. However, even if accepted,[8] those allegations do not address the pleading issues of how this (i) is linked to Mission's supposed unlawful conduct; or (ii) demonstrates an adverse impact on competition in the relevant markets.

**B. The Complaint's Market Share Data Is Insufficient.**

Plaintiffs admittedly have no outpatient market share data to indirectly allege adverse effects. For GAC services, Plaintiffs argue that they do not need to demonstrate that 30-40% of the market was foreclosed, essentially admitting that their Complaint lacks such allegations. Opp. 24-25. Regardless, the Complaint contains no allegations that any competitor's market shares changed *at all* post-COPA, which is dispositive. *See* Mot. 24-25.

**CONCLUSION**

For these reasons and those in the Motion, the HCA Defendants respectfully request that the Court dismiss the Complaint.

---

[8] Plaintiffs' "evidence" of increased prices and reduced output and quality are deficient as both are not unlawful; can be explained by the COPA; and are unconnected to any complained-of provision. Plaintiffs argue that they do not need to "prove causation," Opp. 18, but that does not excuse their pleading burden.

10

Dated: November 4, 2022											Respectfully submitted,

/s/ *Abram Ellis*
Sara Razi (admitted pro hac vice)
Abram Ellis (admitted pro hac vice)
SIMPSON THACHER & BARTLETT LLP
900 G Street NW, Ste. 900
Washington DC, 20001
Phone: (202) 636-5500
sara.razi@stblaw.com
aellis@stblaw.com

Phillip T. Jackson (N.C. Bar No. 21134)
Ann-Patton Hornthal (N.C. Bar No. 35477)
John Noor (N.C. Bar No. 43102)
David Hawisher (N.C. Bar No. 55502)
ROBERTS & STEVENS, PA
P.O. Box 7647
Asheville, NC 28802
Phone: (828) 252-6600
pjackson@roberts-stevens.com
aphornthal@roberts-stevens.com
jnoor@roberts-stevens.com
dhawisher@roberts-stevens.com

*Counsel for the HCA Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2022, the foregoing document was filed via the Court's electronic filing system, which serves all counsel of record in this matter.

*/s/ Abram Ellis*
Abram Ellis (admitted *pro hac vice*)
SIMPSON THACHER &
BARTLETT LLP
900 G Street NW, Ste. 900
Washington DC, 20001
Phone: (202) 636-5500
aellis@stblaw.com
