**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:22-cv-00114-MR**

|  |  |  |
|---|---|---|
| **IN RE MISSION HEALTH ANTITRUST LITIGATION** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <u>**MEMORANDUM OF DECISION AND ORDER**</u> |

_____

**THIS MATTER** is before the Court on the HCA Defendants' Motion to Dismiss the Consolidated Class Action Complaint for Failure to State a Claim [Doc. 45], the Motion to Dismiss of Defendants ANC Healthcare, Inc. F/K/A Mission Health System, Inc. and Mission Hospital, Inc. [Doc. 46], the State of North Carolina's Motion for Leave to File Amicus Curiae Brief [Doc. 56], and the Defendants' Consented-to Motion for Leave to File a Response to the State of North Carolina's Amicus Curiae Brief [Doc. 58].

## I.    PROCEDURAL BACKGROUND

On June 3, 2022, Plaintiff City of Brevard, North Carolina, on its own behalf and on behalf of all others similarly situated, initiated this action against HCA Healthcare, Inc.; HCA Management Services, LP; HCA, Inc.; MH Master Holdings, LLLP; MH Hospital Manager, LLC; MH Mission

Hospital, LLLP (all of which are hereinafter together referred to as "HCA" or the "HCA Defendants"); ANC Healthcare, Inc. f/k/a Mission Health System, Inc.; and Mission Hospital, Inc. (which are hereinafter together referred to as "Mission" or the "Mission Defendants").[1]  [Doc. 1].

On July 27, 2022, Plaintiffs Buncombe County, North Carolina, and City of Asheville, North Carolina, on their own behalf and on behalf of all others similarly situated, initiated an action against the HCA Defendants and the Mission Defendants.  [Civil Case No. 1:22-cv-00147-MR-WCM, Doc. 1].

On August 4, 2022, Plaintiff City of Brevard moved to consolidate Civil Case No. 1:22-cv-00114-MR-WCM and Civil Case No. 1:22-cv-00147-MR-WCM.  [Doc. 41].  On August 8, 2022, the Court entered an Order and Initial Case Management Plan consolidating Civil Case No. 1:22-cv-00114-MR-WCM and Civil Case No. 1:22-cv-00147-MR-WCM for all purposes up to and including trial.  [Doc. 42].  The Court also designated Civil Case No. 1:22-cv-00114-MR-WCM as the lead case and ordered Civil Case No. 1:22-cv-00147-MR-WCM to be closed.  [Id.].

---

[1] The Plaintiffs refer to ANC Healthcare, Inc. and Mission Hospital, Inc. together as the "Mission Defendants" or "Mission."  These Defendants, however, confusingly refer to themselves together as the "ANC Defendants."  These terms all refer to the same two Defendants throughout.

On August 19, 2022, Plaintiffs City of Brevard, North Carolina; Buncombe County, North Carolina; City of Asheville, North Carolina; and Madison County, North Carolina (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, filed a Consolidated Class Action Complaint against the HCA Defendants and the Mission Defendants. [Doc. 43]. In their Consolidated Complaint, the Plaintiffs allege that the Defendants have engaged in an anticompetitive scheme to maintain and enhance monopoly power in two health care services markets in parts of Western North Carolina: (1) the market for inpatient general acute care and (2) the market for outpatient care. [Id. at ¶ 4].

On September 9, 2022, the HCA Defendants moved to dismiss the Consolidated Complaint pursuant to Federal Rule of Procedure 12(b)(6). [Doc. 45]. On that same day, the Mission Defendants moved to dismiss the Consolidated Complaint pursuant to Rule 12(b)(6). [Doc. 46].

On November 8, 2022, the State of North Carolina filed a Motion for Leave to File Amicus Curiae Brief [Doc. 56], and the State conditionally filed its amicus brief in support of the Plaintiffs [Doc. 56-1]. On November 22, 2022, the Defendants filed a Consented-to Motion for Leave to File a Response to the State of North Carolina's Amicus Curiae Brief [Doc. 58], and the Defendants conditionally filed their response [Doc. 58-1]. The State of

North Carolina's Motion for Leave to File Amicus Curiae Brief [Doc. 56] and the Defendants' Consented-to Motion for Leave to File a Response to the State of North Carolina's Amicus Curiae Brief [Doc. 58] are granted, and the Court has considered the Amicus Curiae Brief of the State of North Carolina in Support of Plaintiffs [Doc. 56-1] and the Defendants' Brief in Response to the State of North Carolina's Amicus Curiae Brief [Doc. 58-1].

## II. STANDARD OF REVIEW

The central issue for resolving a Rule 12(b)(6) motion is whether the claims state a plausible claim for relief.  See Francis v. Giacomelli, 588 F.3d 186, 189 (4th Cir. 2009). In considering the Defendants' motion, the Court accepts the allegations in the Complaint as true and construes them in the light most favorable to the Plaintiffs.  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Giacomelli, 588 F.3d at 190-92.  Although the Court accepts well-pled facts as true, it is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see also Giacomelli, 588 F.3d at 189.

The claims need not contain "detailed factual allegations," but must contain sufficient factual allegations to suggest the required elements of a

cause of action.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Consumeraffairs.com, 591 F.3d at 256.  "[A] formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  Nor will mere labels and legal conclusions suffice.  Id.  Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The Complaint is required to contain "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570; see also Consumeraffairs.com, 591 F.3d at 255.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678; see also Consumeraffairs.com, 591 F.3d at 255.  The mere possibility that a defendant acted unlawfully is not sufficient for a claim to survive a motion to dismiss.  Consumeraffairs.com, 591 F.3d at 256; Giacomelli, 588 F.3d at 193.  Rather, the well-pled factual allegations must move a plaintiff's claim from possible to plausible.  Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

## III.  FACTUAL BACKGROUND

Construing the well-pled factual allegations of the Consolidated Complaint as true and drawing all reasonable inferences in the Plaintiffs' favor, the following is a summary of the relevant facts.

In the 1880s, Mission Hospital in Asheville, North Carolina, was originally founded as Dogwood Mission to provide charity care to the sick and poor.  [Doc. 43 at ¶ 60].  In 1951, Defendant Mission Hospital, Inc. was incorporated as a nonprofit institution.  [Id. at ¶ 61].  Defendant ANC Healthcare, Inc. f/k/a Mission Health System, Inc. (hereinafter "Defendant ANC") was incorporated in 1981 as a nonprofit corporation.  From that time until 2019, Defendant ANC and Defendant Mission Hospital, Inc. together (i.e., the Mission Defendants) operated a hospital in Asheville.  In the early 1990s, two private acute care hospitals served the Asheville area: the one operated by the Mission Defendants (hereinafter "Mission Hospital-Asheville") and St. Joseph's Hospital.  [Id. at ¶ 62].[2]

In 1993, the North Carolina General Assembly enacted an initial version of the Certificate of Public Advantage ("COPA"), a regulation allowing

_____

[2] Originally, the Mission Defendants operated only one hospital, which was located in Asheville, and is referred to in this Order as "Mission Hospital-Asheville," to distinguish it from the other facilities that the Mission Defendants later acquired. [See id. at ¶¶ 62-72, 99, 105-106].

6

hospitals to operate with monopoly power in exchange for subjecting themselves to state oversight. [Id. at ¶¶ 7, 62]. In 1995, the General Assembly amended COPA, allowing Mission Hospital-Asheville and St. Joseph's to enter into a partnership. [Id. at ¶ 64]. In 1998, the Mission Defendants purchased St. Joseph's, acquiring all of St. Joseph's assets and operating under one license as "Mission Health System." [Id. at ¶ 65]. The General Assembly amended COPA a second time to facilitate the merger. [Id.]. As a result, "Mission Health System" was exempted from antitrust regulation in exchange for it accepting price regulations in the form of "limit[ing] health care costs" and "control[ing] prices of health care services." [Id. at ¶ 66].

The 1998 amended COPA documented that:

> [Mission and St. Joseph's] dominate the market share in two counties. 91% of Madison County admissions and 87% of Buncombe County admissions are either Memorial Mission[3] or St. Joseph's Hospital. Memorial Mission and St. Joseph's are located in Buncombe County. Madison County, which has no hospital, is closer to the two Asheville hospitals than to any other acute care hospital.

---

[3] The 1998 COPA refers to Mission Hospital-Asheville as "Memorial Mission."

[Id. at ¶ 69]. The 1998 amended COPA also acknowledged that "federal and State antitrust laws may prohibit or discourage" the "cooperative arrangements" that the COPA allowed. [Id. at ¶ 67].

In 2005, a third amended COPA documented that 93.8% of Madison County admissions and 90.6% of Buncombe County admissions took place at Mission's Asheville facilities.[4] [Id. at ¶ 70]. In 2011, a report authored by economist Greg Vistnes (the "Vistnes Report") found that COPA limited Mission's ability to raise prices and margins only at Mission's Asheville facilities. [Id. at 71]. As such, COPA created an incentive for Mission to acquire facilities outside of Asheville. [Id.].

In 2015, the General Assembly repealed COPA, effective January 1, 2018. [Id. at ¶ 73]. By 2016, Mission held a 93% share in the General Acute Care Market ("GAC Market") in Buncombe and Madison Counties. [Id. at ¶ 72]. Between 1995 and 2016, Mission acquired five smaller hospitals in Western North Carolina. [Id.]. On January 1, 2018, the State's direct regulatory authority over the prices charged by Mission ended. [Id. ¶ 73].

---

[4] All references to Mission's Asheville facilities for the period beginning in 1998 refer to the combined operations of what was formerly St. Joseph's Hospital with what was known as Memorial Mission Hospital. Hereinafter such combined operations are referred to herein as "Mission Hospital-Asheville."

In or around 2017, executives of the Mission Defendants entered into private negotiations to sell the assets of both entities to HCA. [Id. at ¶ 74]. On March 21, 2018, the Mission Defendants and the HCA Defendants announced that the HCA Defendants would be acquiring all of Mission's facilities. [Id. at ¶ 75]. On August 30, 2018, the Defendants entered into such an asset purchase agreement ("APA"), which was amended in January 2019. [Id. at ¶ 76]. In January 2019, the asset transfer was completed. [Id. at ¶ 77].

The Plaintiffs allegations of anti-competitive conduct by the Defendants pertain to two defined markets in two defined regions. [Id. at ¶¶ 90-110]. The first of these is defined as the "GAC Market" (i.e., the General Acute Care Market) which pertains to inpatient services, such as medical, surgical, anesthesia, diagnostic, nursing, laboratory, radiology, dietary, and other treatment services provided in a hospital setting to patients requiring one or more overnight stays. [Id. at ¶ 92]. The second market is defined by the Plaintiffs as the "Outpatient Market" which pertains to medical, diagnostic, and treatment services that are not inpatient medical services. [Id. at ¶ 93]. In each of these Relevant Markets, "the service market includes only the purchase of medical services by *private health plans*, namely commercial

insurance plans and employer self-funded plans." [Doc. 43 at ¶ 91] (emphasis added).[5]

The relevant regions as defined by the Plaintiffs are the "Asheville Region" and the "Outlying Region." [Id. at 97]. The "Asheville Region" is defined by the Plaintiffs as consisting of Buncombe and Madison Counties. [Id. at 99]. The "Outlying Region" is defined by the Plaintiffs as consisting of Macon, McDowell, Mitchell, Transylvania, and Yancey Counties.[6] [Id. at ¶ 105]. HCA provides services in the Asheville Region predominately through its flagship facility, the combined facility in Asheville. [Id.]. HCA operates the following hospital facilities in the Outlying Region: Transylvania Regional Hospital; Angel Medical Center, Macon County; Highlands-Cashiers Hospital, Macon County; Mission Hospital McDowell; and Blue Ridge Regional Hospital, Mitchell County. [Id. at ¶ 106].

In health care markets, private health insurance plans negotiate with hospitals for bundles of services that will be offered to members as "in-network" benefits. [Id. at ¶ 79]. Thus, when a health plan's member receives

---

[5] This action does not include "sales of such services to government payers, including Medicare (and Medicare Advantage), Medicaid, and TRICARE (covering military families), because health care providers' negotiations with commercial insurers and employer self-funded plans are separate from the process used to determine the rates paid by government payers." [Doc. 43 at ¶ 91].

[6] Three of these Counties (McDowell, Transylvania and Yancey) border Buncombe County. The other two (Mitchell and Macon) do not, but are in Western North Carolina.

services from that hospital, the health plan will pay the hospital the "allowed amount" for that service, as agreed upon by the health plan and the hospital. [Id.]. "[I]n a geographic region where a significant area is serviced by a single hospital that provides essential health care services, that hospital is essential for health plans to include in their network, and is, in effect a 'must have' hospital for that health plan." [Id. at ¶ 84]. (hereinafter a "Must Have Hospital"). Plaintiffs allege that Mission-Hospital-Asheville is a "Must Have Hospital" in both regions. [Id. at ¶ 122].[7]

The Plaintiffs allege that when HCA contracts with health insurance plans it uses anti-competitive provisions the Plaintiffs identify as "all-or-nothing" provisions, "anti-steering" and "anti-tiering" provisions, and "gag clauses." [Id. at ¶ 120]. Under such "all-or-nothing" provisions, HCA requires health plans to include *all* of HCA's GAC and Outpatient Services in both Regions. [Id. at ¶ 125]. Mission had begun including such "all-or-nothing" provisions in its contracts with health plans as early as 2017. [Id. at ¶ 129]. In 2017, Mission insisted that Blue Cross, the largest health plan in North Carolina, include in its plans all its services covering all inpatient and

---

[7] The Plaintiffs' allegations are unclear as to whether they are asserting that Mission Hospital-Asheville is a "must have" hospital only in the Asheville Region, or in both. Giving the Plaintiffs the benefit of all reasonable inferences, the Court construes this allegation as pertaining to both.

outpatient care in both Regions. [Id.]. When Blue Cross declined, Mission removed itself from Blue Cross's network for GAC and Outpatient Services, resulting in 260,000 people in Western North Carolina being unable to seek care at Mission facilities, including Mission Hospital-Asheville, unless they paid a higher "out of network" cost. [Id.]. Two months later, Blue Cross accepted Mission's terms, including a rate increase and the "all-or-nothing" provision. [Id. at ¶ 130]. This has continued in HCA's relationship with Blue Cross. [Id.].

Under the "anti-steering" and "anti-tiering" provisions, HCA prohibits or inhibits health plans from encouraging their members to use less expensive and/or higher quality health care providers of GAC or Outpatient Services. [Id. at ¶ 131]. These practices include HCA limiting health plans' ability to provide information to members about less expensive health care providers as a condition for such plans including Mission-Hospital-Asheville "in network". [Id. at ¶ 136]. HCA further uses "gag clauses" that prevent insurers from revealing the terms of their agreement in order to obscure their price increases and anticompetitive contracts from regulators and the public. [Id. at ¶ 138].

HCA holds approximately 80% to 90% of the GAC Market in the Asheville Region. [Id. at ¶ 112]. In 2019, Mission Hospital-Asheville held the

12

following market shares in the following Asheville Region zip codes: 88.9% for zip code 28806, 86.5% for zip code 28803, and 87% for zip code 28715. [Id.]. Moreover, HCA holds the following market shares in the following GAC Markets: 88.3% in Yancey County, 89.1% in Madison County, 88.6% in Buncombe County, 85.4% in Mitchell County, 78.7% in Transylvania County, 76.4% in McDowell County, and 74.7% in Macon County. [Id. at ¶ 114]. In zip code 28712 in Brevard, located in Transylvania County, HCA holds an 85.3% market share,[8] while Pardee UNC Hospital holds only a 10.4% market share, despite Pardee UNC being closer and lower cost than Mission Hospital-Asheville. [Id. at ¶ 147]. Similarly, in zip code 28741 in Highlands, located in Macon County, HCA holds a 92.4% market share,[9] while Northeast Georgia Medical Center holds a 7.6% market share, despite being closer and lower cost than Mission Hospital-Asheville. [Id. at ¶ 148]. For Outpatient Services, Mission holds approximately 80% of the Buncombe County market. [Id. at 116].

---

[8] This market share comes from HCA's Transylvania Regional Hospital's 44.8% market share in the zip code and HCA's Mission Hospital-Asheville's 40.5% market share in the same zip code. [Id. at ¶ 147 n. 19].

[9] This market share comes from HCA's Highlands-Cashiers Hospital's 43.8% market share in the zip code and HCA's Mission Hospital-Asheville's 48.7% market share in the same zip code. [Id. at ¶ 148 n. 20].

HCA's high market shares have allowed it to raise prices in the Relevant Markets, and, over the past five years Mission's and HCA's prices for routine or standardized GAC and Outpatient Services have increased at a faster rate than prices for those services statewide. [Id. at ¶¶ 151-152]. A recent RAND analysis[10] shows that Mission and HCA have raised their prices well above the typical prices for routine services and procedures in the Relevant Markets when compared to the prices negotiated between hospitals and health plans for Medicare. [Id. at ¶ 153]. RAND data from 2018 to 2020 shows that, on average, Mission Hospital-Asheville charged commercial insurers 305% above the Medicare price for GAC Services, compared to the North Carolina average of 211% above the Medicare price. [Id. at ¶ 154]. For Outpatient Services, Mission Hospital-Asheville charged commercial insurers 343% above the Medicare price, compared to the North Carolina average of 331% above the Medicare price. [Id.].

Data from a large, private commercial database of health price and claims information provides examples of HCA's average prices for specific procedures. [Id. at ¶ 156]. For example, HCA's average price to health plans for C-sections without complications at Mission Hospital-Asheville was

---

[10] RAND is a corporate research organization that analyzes and reports hospital price data at the systemwide level. [See id. at ¶ 154]. RAND does not report the prices charged for specific procedures. [Id.].

14

$10,076 in 2020, while the statewide average was $4,373. [Id. at ¶ 157]. From 2017 to 2020, prices for a C-section without complications increased 17.3% at Mission Hospital-Asheville, compared to a 14.4% increase across the rest of North Carolina. [Id.]. Over the same period, the price for a shoulder arthroscopy at Mission Hospital-Asheville increased by 75%, while it increased only 19% statewide, reaching $2,419 in 2020, compared to the statewide average of $897. [Id. at ¶ 159]. For stress tests, the average price declined by 10% statewide, while increasing by 29% at Mission Hospital-Asheville. [Id. at ¶ 158]. Similarly, the average price of a lipid panel declined by 19% statewide, while increasing approximately 31% at Mission. [Id. at ¶ 160].

At Mission Hospital McDowell, the average price for a CT scan of the abdomen and pelvis is approximately $2,000, compared to the statewide average of just under $500. [Id. at ¶ 164]. Since COPA has been repealed, prices for Outpatient Services at Mission Hospital McDowell have gone from being well below the statewide average to being approximately 50% above the statewide average. [Id. at ¶ 165]. Now, prices for Outpatient Services at Mission Hospital McDowell are within the top 3% of prices in North Carolina, making it more costly than its only potentially significant competitor, Carolinas HealthCare System Blue Ridge Morganton. [Id. at ¶¶ 165-166].

Since 2019, HCA has discontinued certain health care services. Under the Asset Purchase Agreement (APA), the Defendants asserted that they had "no present intent to discontinue any of the community activities, programs or services provided" prior to HCA's purchase of Mission. [Id. at ¶ 169]. However, in October 2019, HCA closed outpatient rehabilitation clinics in Candler and Asheville, and, in 2020, it closed primary care practices in Candler and Biltmore Park, as well as chemotherapy services in Brevard, Franklin, Marion, and Spruce Pine. [Id.]. Under the APA, HCA also "promised" to maintain until January 2029 the same level of charity care coverage that Mission had prior to the acquisition. [Id. at ¶ 185]. However, HCA has reduced coverage for non-emergency services, implemented a requirement that out-of-pocket expenses exceed $1,500 to qualify for charity care coverage, and ended pre-approval for charity care coverage. [Id.].

HCA has also reduced budgets and staffing at Mission Hospital-Asheville and at its five smaller hospitals in the Outlying Region. [Id. at ¶ 170-171]. As of March 2021, at least 79 doctors have left or planned to leave HCA facilities, while others describe new employment contracts with HCA as removing quality of care metrics and focusing on the number of patients seen and amount billed. [Id. at ¶ 172]. Nurses working in HCA facilities have described their units as "inhumanely understaffed." [Id. at ¶ 173].

16

The North Carolina Department of Justice has received complaints about primary care and OB/GYN physicians leaving Mission facilities, the absence of mammogram services at Mission's Transylvania County Regional Hospital, reduced nursing and administrative staffing in emergency departments, inadequate staffing in Mission's mental health facilities, the closure of cancer treatment practices, unclean facilities, long wait times for patients, and increased prices. [Id. at ¶¶ 176-177]. The Leapfrog Group, and independent organization that assesses quality of care, downgraded Mission Hospital-Asheville from an "A" to a "B," noting that the facility fell short in infections, high-risk baby deliveries, some cancer treatment procedures, and patients' experience with elective surgeries. [Id. at ¶ 180]. In 2020, the Centers for Medicare and Medicaid Services ("CMS") also threatened to terminate its contract with HCA/Mission over concerns for patient safety. [Id. at ¶ 181]. Most recently, CMS, which uses patient survey responses about cleanliness and the responsiveness of hospital staff, graded Mission Hospital-Asheville two out of five possible stars. [Id. at ¶ 182].

## IV.    DISCUSSION

In their Consolidated Complaint, the Plaintiffs assert claims for unreasonable restraint of trade in violation of § 1 of the Sherman Antitrust Act ("Sherman Act") and unlawful monopolization under § 2 of the Sherman Act.  [Doc. 43 at ¶¶ 201-213].  The Defendants move to dismiss both claims. [Doc. 45 at 1; Doc. 46 at 1].

### A.    Statute of Limitations

The ANC Defendants (i.e., the Mission Defendants) argue that the Plaintiffs' claims against them are barred by the statute of limitations as the Plaintiffs have failed to allege any unlawful conduct by them occurring within the four-year limitations period immediately preceding the filing of this action (i.e., after June 3, 2018). [Doc. 47 at 16 -17]. Specifically, the Mission Defendants argue that the only specific contract referenced in the Consolidated Complaint is from 2017, outside of the four-year limitations period. [Id. at 16-17; see also Doc. 43 at ¶ 77].  The Mission Defendants further argue that in January 2019, ANC sold the assets of Mission Health to HCA and have not provided health care services since that time, and that because the Plaintiffs did not specifically allege that either of the Mission Defendants entered into any anticompetitive contractual terms between June

18

3, 2018, and January 2019, the Plaintiffs' claims against them must be dismissed. [Id. at 17-19].

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, and the burden of establishing the affirmative defense rests on the defendant." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (internal citation omitted). Therefore, the Court generally cannot reach the merits of an affirmative defense in ruling on a motion to dismiss under Rule 12(b)(6). Id. Only in those extraordinary circumstances where all facts necessary to the affirmative defense "clearly appear[ ] on the face of the complaint" may the Court address an affirmative defense at the motion to dismiss stage. Richmond v. Fredericksburg & Potomac R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993).

"[D]amages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued[.]'" Zenith Radio Corp. v. Hazeltine Rsch., Inc., 401 U.S. 321, 338 (1971) (citing 15 U.S.C. § 15b)). The statute of limitations begins to run when a defendant commits an act that causes economic injury to the plaintiff. Id.; see also Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp., 828 F.2d 211, 217 (4th Cir. 1987). Where there is a continuing violation of antitrust law,

"each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him to recover the damages caused by that act and . . . the statute of limitations runs from the commission of the act." Zenith Radio Corp., 401 U.S. at 338. Thus, "in the case of a continuing violation . . . each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997) (analogizing the accrual of private causes of action under federal antitrust law to civil RICO actions); see also Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 673 (4th Cir. 1976) (explaining that where "the plaintiff charges a continual refusal to deal, the statute of limitations commences to run from the last overt act causing injury to the plaintiff's business"); Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004) (explaining that "even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act").

In the context of continuing antitrust violations, where the alleged harm results from anticompetitive vertical contracts executed before the statute of limitations period, "[a]cts that are merely 'unabated inertial consequences' of a single act do not restart the statute of limitations." Varner, 371 F.3d at 1019

(quoting Barnosky Oils, Inc. v. Union Oil Co. of California, 665 F.2d 74, 82 (6th Cir. 1981)).  Rather, to restart the statute of limitations, an over act "[(1)] must be a new and independent act that is not merely a reaffirmation of a previous act, and (2) it must inflict new and accumulating injury on the plaintiff."  Id.; see also U.S. Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43 (2nd Cir. 2019) (quoting DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467 (6th Cir. 1996)).  Under this principle, execution or active enforcement of a contract is an overt act, but mere performance under that contract is insufficient to restart the statute of limitations. See Varner, 371 F.3d at 1020; see also U.S. Airways, 938 F.3d at 69; Eichman v. Fotomat Corp., 880 F.2d 149, 160 (9th Cir. 1989).  Therefore, benefits or payments received by a defendant under a contract executed prior to the limitations period do not constitute an overt act that restarts the statute of limitations. See Varner, 371 F.3d at 1019-20 (holding that performance under "tying" contract executed prior to the limitations period did not constitute a continuing violation); U.S. Airways, 938 F.3d at 69 (holding that supracompetitive prices charged under contract executed prior to the limitations period did not constitute an overt act that restarted the statute of limitations); Eichman, 880 F.2d at 160 (holding that plaintiffs' "lease-tying claim" was barred by the statute of limitations, despite the defendant's receipt

of profits following the execution of the lease agreement); Aurora Enters., Inc. v. Nat'l Broad. Co., Inc., 688 F.3d 689, 694 (9th Cir. 1982) (holding that the defendant's receipt of profits under a contract executed prior to the limitations period did not restart the statute of limitations).

According to the Consolidated Complaint, the "Defendants' Scheme involves a web of contracts that Defendants have imposed on insurers," including "all-or-nothing clauses," anti-steering and anti-tiering provisions, and gag clauses. [Doc. 43 at ¶ 120]. The only specific contract referenced in the Consolidated Complaint is a 2017 contract between Mission and Blue Cross, in which Mission required the inclusion of inpatient and outpatient services in all Relevant Geographic Markets. [Id. at ¶ 129]. The Plaintiffs do not allege any specific anticompetitive contract between the Mission Defendants and any insurer between June 3, 2018 and January 2019, when HCA acquired Mission's assets. Rather, the Plaintiffs allege that "*beginning in or about 2017*, Mission (then ANC), under its immediate pre-buyout executive management team, had *embarked on a continuing, multifaceted coercive Scheme* designed to foreclose competition from rivals, to maintain or to enhance its monopoly power in the Relevant Markets, and ultimately to charge supracompetitive prices . . . for GAC and Outpatient Services." [Id. at ¶ 12] (emphasis added).

The facts necessary to determine whether the Plaintiffs' claims against the Mission Defendants are time-barred do not "clearly appear[ ] on the face of the complaint." Indeed, the Plaintiffs' allegation that the Defendants' anticompetitive conduct *began* in 2017 and continued thereafter leaves the Court to speculate as to precisely when the allegedly anticompetitive contracts were formed. However, the Plaintiffs' allegations, taken in the light most favorable to the Plaintiffs, and giving the Plaintiffs the benefit of all reasonable inferences, indicate that contracts with the allegedly anticompetitive provisions were executed after 2017, within the limitations period. Notably, according to the Plaintiffs, the Consolidated Complaint "does not allege the specific dates of the contracts and other violations because that information lies in the hands of Defendants."[11] [Doc. 49 at 12]. Thus, at this early stage of litigation, the Plaintiffs are entitled to the reasonable inference that the last anticompetitive act of the Mission Defendants was committed within the limitations period. Accordingly, the motion to dismiss of the Mission Defendants based on the statute of limitations defense is denied.

---

[11] According to the Plaintiffs, "[t]hey pay for health care services according to master contracts negotiated between third-party administrators and providers such as HCA," and, therefore, they "do not have access to those contracts." [Doc. 49 at 13 n. 4].

## B. Section 1 Claim

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To state a claim under § 1, a plaintiff must allege facts that show "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint on trade." Dickson v. Microsoft Corp., 309 F.3d 193, 203 (4th Cir. 2002). Courts typically review vertical restraints on trade under the rule of reason to determine whether conduct is an unreasonable restraint on trade.[12] Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 59 (1977) ("When anticompetitive effects are shown to result from particular vertical restrictions they can be adequately policed under the rule of reason, the standard traditionally applied for the majority of anticompetitive practices challenged under [§ 1]."); see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) ("The rule of

---

[12] "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Business Elec. Corp. v. Sharps Elec. Corp., 485 U.S. 717, 730 (1988). Here, the HCA Defendants argue that "[t]he alleged restraints pled in the Complaint – "all-or-nothing" arrangements, anti-steering clauses, and price confidentiality provisions – are all examples of vertical restraints subject to a rule of reason analysis." [Doc. 45-1 at 24]. Neither the Mission Defendants nor the Plaintiffs contest that the alleged restraints involved in this matter are vertical restraints.

reason is the accepted standard for testing whether a practice restrains trade in violation of [§ 1].").

Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T.V., 433 U.S. at 49. A restrictive practice is unreasonable where "its anticompetitive effects outweigh its procompetitive effects." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342 (1990). At the pleading stage, a plaintiff may assert a claim that a restrictive practice is unreasonable by alleging facts that demonstrate the practice produced anticompetitive effects in the relevant markets. United States v. Charlotte-Mecklenburg Hosp. Auth., 248 F. Supp. 3d 720, 728 (W.D.N.C. 2017) (citing W. Penn. Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 100 (3d Cir. 2010)). "Anticompetitive effects include increased prices, reduced output, and reduced quality." W. Penn. Allegheny Health Sys., 627 F.3d at 100.

A plaintiff can assert a claim that a practice produced anticompetitive effects directly by alleging facts that indicate "an actual adverse effect on competition." Charlotte-Mecklenburg Hosp. Auth., 248 F. Supp. 3d at 728 (citing Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 96 (2d Cir. 1998)). Alternatively, a plaintiff can assert a claim based on indirect anticompetitive

effects by alleging facts that indicate that the defendant has "sufficient market power to cause an adverse effect on competition." Id. However, market power is necessary, but not sufficient, to indirectly demonstrate adverse effects on competition. Id. Rather, a plaintiff "must show market power plus 'some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market.'" Id. (quoting Tops Mkts., Inc., 142 F.3d at 97).

The Defendants argue that the Plaintiffs have failed to allege specific anticompetitive contract provisions. [Doc. 45-1 at 14]. In their Consolidated Complaint, the Plaintiffs do not allege specific contractual language or point to any specific example of an anticompetitive contract in the Relevant Markets, aside from one example provided from 2017. Rather, the Plaintiffs allege that, starting in 2017, the Defendants' contracts with health insurers in the Relevant Markets include "all-or-nothing" provisions, anti-steering and anti-tiering provisions, and gag clauses. [Doc. 43 at ¶¶ 12, 120, 131, 136, 138]. The Plaintiffs further allege that these provisions require health plans to include the Defendants' GAC and Outpatient Services in the Outlying Regions and their Outpatient Services in the Asheville Region; prevent health insurers from giving members information about less expensive health

26

care providers; and prevent health plans from revealing the terms of their agreements with the Defendants. [Id. at ¶ 125, 131, 136, 138]. The Plaintiffs reference one contract, executed in 2017, in which Mission allegedly required Blue Cross to include Mission's inpatient and outpatient services in the Asheville and Outlying Regions in order to keep the "Must Have Hospital" (Mission Hospital-Asheville) "in-network." [Id. at ¶ 122, 129]. In addition, the Plaintiffs have alleged that the Defendants have employed contract provisions that thwart competition, even identifying what types of provisions those are, and have alleged circumstances that give rise to a reasonable inference that Defendants' contracts actually contain such provisions. At this stage of the litigation it is of no consequence that Plaintiffs have not cited with particularity to such provisions. It is noted that the Plaintiffs do not have access to the allegedly anticompetitive contracts. [Doc. 48 at 12; Doc. 49 at 13 n.4]. As such, the Plaintiffs are unable to provide specific details at this early stage of litigation.

The Defendants also argue that the Plaintiffs have failed to allege that the Defendants' conduct harmed competition in the Relevant Market. [Doc. 45-1 at 23]. However, the Plaintiffs have alleged that HCA holds between 74% and 90% of the GAC Market in the Asheville and Outlying Regions and approximately 80% of the market for Outpatient Services in Buncombe

County, [Doc. 43 at ¶¶ 112, 114, 116], and the Plaintiffs have also alleged numerous anticompetitive effects of HCA's allegedly anticompetitive contract provisions. Specifically, the Plaintiffs have alleged that HCA has raised prices and decreased quality for its health care services. [Id. at ¶¶ 151-182]. The Plaintiffs have also alleged numerous specific examples of price increases for specific health care services,[13] [id. at ¶¶ 153-166], the discontinuation of certain health care services, [id. at ¶ 169], complaints from patients and health care providers about understaffing and quality of care, [id. at ¶¶ 170-177], and the downgrading of Mission Hospital-Asheville by organizations that assess quality of care [id. at ¶¶ 180-182]. All of these allegations, taken together and separately, plausibly assert that Defendants' conduct has harmed competition.

---

[13] The Defendants also argue that "most of the price data that Plaintiffs rely upon is from Medicare, which the Complaint alleges is irrelevant, and which cannot show that Mission charged supracompetitive prices in its contracts with commercial insurers." [Doc. 45-1 at 28-29] (internal citation omitted). The Plaintiffs, however, allege that RAND data compares "the prices negotiated between hospitals and health plans to the fee schedule set by Medicare," which "act[s] as a relative baseline[.]" [Doc. 43 at ¶¶ 153-154]. The Plaintiffs do not allege that the prices charged by HCA are the prices charged under Medicare. Rather, the Plaintiffs use the RAND data as a baseline from which to allege that the prices charged by Mission Hospital-Asheville are higher than the average prices statewide. [See id. at ¶ 154]. However, the Plaintiffs also allege specific examples of prices charged by HCA using "[t]he pricing data for specific standardized medical procedures from a large private, commercial database of health price and claims information." [Id. at ¶¶ 156-160, 163-164]. There is nothing in the Consolidated Complaint, and the Defendants point to nothing, to indicate that the pricing information from the commercial database is based on Medicare data.

The Defendants argue that the Plaintiffs' Consolidated Complaint should be dismissed because the allegedly anticompetitive contract provisions also have procompetitive effects. [Doc. 45-1 at 26-27]. At the pleading stage, however, the Court accepts the truth of factual allegations in the Consolidated Complaint, and the Court "will assume that the plaintiffs can prove the facts that they allege in their complaint." Estate Const. Co. v. Miller & Smith Holding Co., Inc, 14 F.3d 213, 221 (4th Cir. 1994). Further, "determining whether a restraint on trade is unreasonable is a fact-intensive inquiry." Charlotte-Mecklenburg Hosp. Auth., 248 F. Supp. 3d at 729. In the health care context, the Court "should consider, among other things, the facts peculiar to the health care industry, the effect of the activities on health providers, and the impact of the activities on costs to the ultimate consumer," as well as "[t]he history of restraint and the purpose or end sought[.]" Id. at 729-30 (quoting Ratino v. Med. Serv. of D.C. (Blue Shield), 718 F.2d 1260, 1272 (4th Cir. 1983)). Accordingly, questions about whether the procompetitive effects of the Defendants' contracts with insurers outweigh the harm to competition alleged by the Plaintiffs are "best resolved after the benefit of discovery, allowing the fact finder to evaluate the purposes and competitive effects within the specific context of [the Relevant Markets] and insurance industry." Id. (explaining that plaintiff's complaint should not be

dismissed where plaintiff alleged direct evidence of market harm and defendant hospital system argued that contractual restrictions had pro-competitive effects).

Therefore, the Defendants' motions are denied with respect to the Plaintiffs' claim under § 1 of the Sherman Act.

### C.    Section 2 Claim

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . ." 15 U.S.C. § 2. "Simply possessing monopoly power and charging monopoly prices does not violate § 2[.]" Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc., 555 U.S. 438, 447-48 (2009); Verizon Commc'ns, Inc. v. Law Offs. of Cutis v. Trinko, LLP, 540 U.S. 398, 407 (2004) ("The opportunity to charge monopoly prices – at least for a short period – is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.").  Rather, to state a claim under § 2, a plaintiff must plausibly allege "(1) the possession of

monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Thus, "[t]o run afoul of Section 2, a defendant must be guilty of illegal conduct 'to foreclose competition, gain a competitive advantage, or destroy a competitor.'" E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc., 637 F.3d 435, 450 (4th Cir. 2011) (quoting Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482-83 (1992)).

"In analyzing Sherman Act Section 2 claims . . . courts begin with a preliminary inquiry into market definition, which serves as a tool to determine the defendant's market power." Id. at 441. Thus, a plaintiff must allege both a relevant product market and a relevant geographic market. Id. Here, the Plaintiffs allege that the Defendants possess monopoly power in the GAC Market and the Outpatient Market in the Asheville and Outlying Regions. [Doc. 43 at ¶¶ 90-110]. The Defendants do not argue that the Plaintiffs have failed to allege a relevant product market or a relevant geographic market. Rather, with regard to the Plaintiffs' § 2 claim, the Defendants argue that they acquired their purported monopoly power lawfully under the COPA. [Doc. 45-1 at 8, 14, 16; Doc. 47 at 7, 14-15]. In addition, the Mission Defendants

argue that the Plaintiffs have failed to allege that they unlawfully maintained monopoly power because "Mission Health's continued monopoly power is equally consistent with lawful behavior."  [Doc. 47 at 15-16; Doc. 45-1 at 17]. The HCA Defendants also argue that the Plaintiffs have failed "to allege that Mission even has monopoly power in the [O]utpatient [M]arket."  [Doc. 45-1 at 14, 17].[14]

Regarding the Defendants' argument that the alleged monopoly power was acquired lawfully under the COPA, the Plaintiffs' Consolidated Complaint does not allege the monopoly power acquired under the COPA was unlawful. Rather, the Plaintiffs' Consolidated Complaint alleges that the Defendants' implemented a coercive scheme using anticompetitive means to foreclose competition, maintain and enhance the Defendants' monopoly power, and ultimately charge supracompetitive prices in the Relevant Markets – *after* – the expiration of the COPA.  [See Doc. 43 at ¶¶ 12-23, 120-141]. Further, the Plaintiffs' Consolidated Complaint sufficiently alleges HCA

---

[14] The Plaintiffs' § 2 claim is based on the same allegations as their § 1 claim. "A § 1 violation is legally distinct from that under § 2 ... though the two sections overlap in the sense that a monopoly under § 2 is a species of trade restraint under § 1. The same kind of practices, therefore, may evidence violations of both." Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002) (quotations and citations omitted). The Court has already addressed the Defendants' arguments regarding the Plaintiffs' § 1 claim. As such, the Court only addresses the Defendants' arguments pertaining to Plaintiffs' § 2 claim that are distinct form their previous § 1 arguments.

Defendants' have monopoly power over the Outpatient Market. Specifically, the Consolidated Complaint alleges that, in large part due to the Defendants' alleged scheme to maintain and enhance monopoly power, the HCA Defendants have reduced the availability and quality of Outpatient Services in the Outlying Region, in turn compelling patients to travel to HCA Defendants' Asheville facilities, and have caused prices for Outpatient Services in the Outlying Region to substantially increase relative to other providers in North Carolina. [Doc. 43 at ¶¶ 117, 149, 155, 165]. Accordingly, at this stage of the proceedings, the Plaintiffs' have plausibly stated a claim under § 2 of the Sherman Act against the Defendants.

Therefore, the Defendants motions are denied with respect to the Plaintiffs' claim under § 2 of the Sherman Act.

## ORDER

**IT IS, THEREFORE, ORDERED**, that the HCA Defendants' Motion to Dismiss the Consolidated Class Action Complaint for Failure to State a Claim [Doc. 45], and the Motion to Dismiss of Defendants ANC Healthcare, Inc. F/K/A Mission Health System, Inc. and Mission Hospital, Inc. [Doc. 46], are hereby **DENIED**.

**IT IS FURTHER ORDERED** that the State of North Carolina's Motion for Leave to File Amicus Curiae Brief [Doc. 56], and the Defendants'

Consented-to Motion for Leave to File a Response to the State of North Carolina's Amicus Curiae Brief [Doc. 58], are hereby **GRANTED**.

**IT IS SO ORDERED.**

Signed: February 21, 2024

Martin Reidinger
Chief United States District Judge